### IN THE UNITED STATES DISTRICT COURT FOR THE
### NORTHERN DISTRICT OF ILLINOIS
### WESTERN DIVISION

| | | |
|---|---|---|
| GUSTAVO NEVAREZ, JR., an individual, | ) | |
| | ) | Case No. 3:24-cv-50369 |
| Plaintiff, | ) | |
| | ) | Judge Iain D. Johnston |
| vs. | ) | |
| | ) | Magistrate Judge Lisa A. Jensen |
| BOONE COUNTY, ILLINOIS, a body politic and | ) | |
| corporate, and DIANE ZIMMERMAN, an individual in | ) | |
| her official capacity, | ) | |
| | ) | |
| Defendants. | ) | |

### <u>MEMORANDUM OF LAW IN SUPPORT OF</u>
### <u>DEFENDANTS' 12(b)(6) MOTION TO DISMISS</u>

NOW COME the Defendants, BOONE COUNTY, ILLINOIS, a body politic and

corporate, and DIANE ZIMMERMAN, an individual in her official capacity, by their attorneys,

Reno & Zahm LLP, and for their Memorandum of Law in support of Defendants' 12(b)(6)

Motion to Dismiss, state as follows:

### I. INTRODUCTION.

Plaintiff, GUSTAVO NEVAREZ, JR. ("Nevarez") has filed suit against BOONE

COUNTY, ILLINOIS ("Boone County"), and DIANE ZIMMERMAN, in her official capacity

("Zimmerman"), alleging that Mr. Nevarez's U.S. constitutional due process rights and civil

rights were violated and/or are being violated based on suspension of his rights to have

temporary use permitted events for one year and the revocation of a pending temporary use

permit application. Compl. at ¶¶ 50-67. According to the allegations of the Complaint, Boone

County has violated Plaintiff's procedural due process rights and civil rights in suspending his

ability to obtain temporary use permits ("TUPs") and revoking his pending TUP application, and

therefore, the Court should issue (amongst other relief requested) an injunction to the Defendants

allowing Plaintiff to complete the TUP process for his upcoming animal show and enjoin Boone County from interfering with his right to apply for and have TUP events scheduled in the future. *Id.*

In reality, this case is about Plaintiff's ongoing and continuous failure and refusal to comply with basic zoning regulations and rules relating to the animal shows subject of the TUPs – not racial discrimination or denial of any rights of Plaintiff on the basis of his national origin.

Aside from factual allegations, Plaintiff has asserted three (3) legal claims against Boone County, each relating to some sort of theory that Boone County has discriminated against him based on his national origin:

- Invalidity of suspension and revocation is violative of U.S. Constitution procedural due process.

- Civil rights violation – 42 U.S.C., § 1983.

- Injunctive relief relating to alleged unlawful denial of right to procedural due process.

Each of these claims is unfounded, both in law and in fact. As a result, the Complaint should be dismissed in its entirety.

## II.     ARGUMENT.

In order to "survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); see also Fed. R. Civ. Pro. 12(b)(6) (West 2024). A motion to dismiss should not be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-6 (1957).

A.  **This case should be dismissed in its entirety as Plaintiff has failed to exhaust his administrative remedies and has failed to satisfy the finality requirement.**

Plaintiff has not satisfied exhaustion requirements. Plaintiff has a right to appeal the suspension of his right to obtain TUPs, and has, in fact, pursued an appeal of the suspension. See Ex. A (Copy of communications dated August 30, 2024, and September 3, 2024, confirming that the appeal request will be published Thursday, September 5, 2024, with a hearing scheduled for September 24, 2024, at 7:00 p.m.). While a "failure to exhaust administrative remedies" attack is technically an affirmative defense, "when the existence of a valid affirmative defense is so plain from the face of the complaint that the suit can be regarded as frivolous, the district court judge need not wait for an answer before dismissing the suit." *Walker v. Thompson*, 288 F. 3d 1005, 1009 (7th Cir. 2002). Since all counts of the Complaint relate to the suspension of Plaintiff's ability to obtain a TUP and/or revocation of a pending TUP application, the Complaint is not ripe and must be dismissed.

The Supreme Court has directed a special ripeness analysis doctrine as it relates to constitutional property rights claims. Specifically, federal courts are precluded from "adjudicating land use disputes until: (1) the regulatory agency has had an opportunity to make a considered definitive decision, and (2) the property owner exhausts available state remedies for compensation." *Forseth v. Vill. of Sussex*, 199 F.3d 363, 368 (7th Cir. 2000). As admitted in the allegations of the Complaint, Plaintiff has not met the second of these elements. Plaintiff applied for appeal of both the suspension and the denial of its TUP. See Ex. B. The appeal specifically seeks an appeal of the decisions for "one year suspension of any TUP's for Gustavo Nevarez, and (2) revocation of Nevarez's September 15, 2024 TUP for an Animal Show Event." Ex. B. Plainly, this is a matter that Plaintiff may address with the County Zoning Administrator, and by filing an appeal, Plaintiff has acknowledged acceptance and notice of the same. In short,

Plaintiff is accusing Boone County of violating Plaintiff's due process rights while ironically failing to pursue his available due process. Plaintiff's claims are not ripe for a federal court's review, and the Complaint must be dismissed.

The United States Supreme Court decision in *Knick vs. Township of Scott* casts doubt as to whether a party must exhaust administrative remedies prior to bringing a § 1983 claim. *Knick vs. Twp. of Scott*, 588 U.S. 180 (2019). While there does not appear to be a Seventh Circuit decision reevaluating *Knick*'s impact on exhaustion of administrative remedies in § 1983 claims, the Northern District's Eastern Division (in an unpublished decision) has stated as follows:

> Thus, where the challenged government action gave rise to a takings claim subject to exhaustion in state court, the Seventh Circuit required that any other constitutional claims arising from that action be exhausted in state court as well. See *Gamble v. Eau Claire County*, 5 F.3d 285, 287 (7th Cir. 1993) ("Williamson holds that even if a taking can be challenged as a denial of substantive due process, a suit based on this theory is premature if the plaintiff has possible state remedies against the zoning regulation or other state action that he wants to attack."). With takings claims now no longer subject to the exhaustion requirement, the Seventh Circuit's rationale for requiring exhaustion for procedural and substantive due process claims challenging state or local land use regulations has evaporated. Moreover, maintaining the administrative exhaustion requirement would be directly contrary to the Supreme Court's stated purpose in *Knick* of ensuring that all constitutional claims brought under § 1983 be treated the same.

*James v. City of Evanston*, 20-CV-00551, 2021 WL 4459508, at *5 (N.D. Ill. Sept. 29, 2021)

The Supreme Court's decision in *Knick* involves a public use or taking. *Knick vs. Twp. of Scott*, 588 U.S. 180 (2019). This case does not, in that it involves the denial of a temporary use application and related suspension of ability to apply for future temporary uses. There is no taking involved, so this case is distinguishable, as the Court's rationale in repudiating the exhaustion of state remedies is based on the fact that a right to just compensation arises at the time of the taking. *Knick v. Twp. of Scott*, 588 U.S. 180, 201-05 (2019).

4

Even if this Court finds the case is not distinguishable, Plaintiff is not relieved from its finality requirements. The Supreme Court recently confirmed finality requirements still apply in light of *Knick*, noting "until the government makes up its mind, a court will be hard pressed to determine whether the plaintiff has suffered a constitutional violation." *Erickson v. Vill. of Yorkville*, 681 F. Supp. 3d 871, 880 (E.D. Wis. 2023) (quoting *Pakdel v. City & Cnty. of San Francisco, California*, 594 U.S. 474, 480, 141 S. Ct. 2226, 2231, 210 L. Ed. 2d 617 (2021)). The Supreme Court confirmed "a plaintiff's failure to properly pursue administrative procedures may render a claim unripe if avenues still remain for the government to clarify or change its decision." *Id.* In this situation, Plaintiff initiated an appeal with the Boone County Board of Appeals ("ZBA") that is pending and set to be heard on September 24, 2024. This is an avenue – chosen by the Plaintiff – in which the Defendants may clarify or change the decision(s) subject of this lawsuit. Plaintiff has made no claims or allegations of any kind (and certainly has not offered any evidence) that an appeal to the ZBA will be futile or that the ZBA is somehow biased against him.

Plaintiff attempts to overcome these deficiencies, both in terms of exhaustion and finality, in the Complaint by arguing that Plaintiff is not required to exhaust administrative remedies or obtain a final decision because Boone County's action was not authorized by law and that any such action would be "futile." See Compl. at ¶¶ 56-57.

Paragraph 56 of the Complaint alleges that, "[t]he ordinance warning and suspension were not issued by the Zoning Enforcement Officer as required by Section 4.2.10 but rather by the County Board Chairman and the States Attorney's Office." While the letter notifying Plaintiff of the suspension may have been sent by the State's Attorney, the letter clearly indicates that the suspension was issued by the Zoning Enforcement Officer. As noted extensively in Mr.

Nevarez's Complaint, this is the second lawsuit filed by Mr. Nevarez. See Compl. at ¶¶ 11, 32, 59. Mr. Nevarez also threatened litigation to Boone County employees in correspondence with Boone County. See Ex. C. Having Boone County's attorney communicate with Plaintiff in this situation is not a violation of the county ordinance, but instead, a prudent action considering the circumstances and history of this case.

Plaintiff next argues that because he had "essentially completed his application," Boone County was required to make a determination in accordance with 4.2.10 that allows revocation if there is an "inaccurate or incomplete application" or if the zoning officer becomes aware of information they believe poses "a serious threat to health, welfare, security, or safety of any resident of Boone County." See Compl. at ¶56. First, Plaintiff admits the application was not complete. Second, it misstates the ordinance at issue. Pursuant to Section 4.2.6(F) of the ordinance, "[t]he zoning enforcement officer shall have the authority to deny a temporary use permit if the applicant has a demonstrated and documented failure to comply with the regulations of a similar previously granted temporary use permit." While true that a TUP may be revoked upon a serious threat to health, safety or the like, a TUP may be denied on other grounds as well – such as the past failures to comply evident and admitted by the Plaintiff in this case.

Finally, Nevarez argues that seeking an administrative remedy in this case would be "futile," as they have shown "a bias against animal shows in general." Compl. at ¶ 57. Not only is this completely speculative and without any basis, it is contrary to the facts of the situation. Mr. Nevarez filed the original lawsuit over two (2) years ago. Since that time, he has had numerous animal shows, and the related temporary use permits were granted (including two this year held in July and August). Plaintiff was notified of the amended ordinance imposing additional requirements on animal shows and was specifically warned of the types of violations

he had to cure after his July show. After being given an opportunity to cure, he then committed the same violations in August leading to his suspension and the termination of his pending application for a TUP. Boone County has shown no bias towards Plaintiff, and there is no basis to conclude that Boone County has a predetermined decision already made in this situation. Plaintiff has a right to appeal. Plaintiff <u>chose</u> to appeal. Boone County promptly scheduled the appeal and set it for the next hearing date available.

To fall under the futility exception, Plaintiff must show "it is certain that [his] claim will be denied on appeal, not merely that [he] doubts that an appeal will result in a different decision." *Smith v. Blue Cross & Blue Shield United of Wis.*, 959 F.2d 655, 659 (7th Cir. 1992) (emphasis added). To fall under a futility exception, Plaintiff would need to supply evidence to support the claim, beyond mere speculation and belief. *Lindemann v. Mobil Oil Corp.,* 79 F.3d 647, 650 (7th Cir. 1996). Plaintiff fails to offer any evidence to support futility.

B.     **This Case Should be Dismissed or Stayed Because Plaintiff Already Filed a Parallel State Court Lawsuit**

This case should be dismissed or stayed because Plaintiff has already filed a nearly identical state court lawsuit. Plaintiff filed a state court lawsuit alleging violation of Plaintiff's Substantive and Procedural Due Process Rights, Equal Protection violations, violations of county ordinances, violations of the Illinois Constitution, and for mandamus, on or about May 17, 2022. Plaintiff ultimately filed a third amended complaint on July 20, 2023, alleging violation of Plaintiff's Substantive and Procedural Due Process Rights, Equal Protection violations, violations of county ordinances, violations of the Illinois Constitution, and Civil Rights violations. Ex. D. Defendant, Boone County, filed its answer to that lawsuit on November 13, 2023. Written discovery has been exchanged and responded to, and the parties have conducted multiple depositions with additional depositions scheduled in the upcoming weeks and months.

On September 6, 2024, late on a Friday night, after over 27 months of litigation in state court, Plaintiff filed this lawsuit in federal court.

Defendants seek to dismiss or stay Plaintiff's lawsuit under *Colorado River Water Conservation Dist. v. U.S.*, 424 U.S. 800 (1976). In that case, the Supreme Court ruled "dismissal in the event of an exercise of concurrent jurisdiction" may be appropriate depending on the facts and circumstances involved. *Id.* at 818. The Supreme Court further clarified in *Will v. Calvert Fire Ins. Co.* that "such deference may be equally appropriate even when matters of substantive federal law are involved in the case." *Will v. Calvert Fire Ins. Co.*, 437 U.S. 655, 664 (1978) (Rehnquist, J.) (plurality opinion).

The Seventh Circuit has adopted the Colorado River doctrine, directing courts to "first determine whether the concurrent state and federal actions are actually parallel." *LaDuke v. Burlington N. R. Co.*, 879 F.2d 1556, 1559 (7th Cir. 1989). Lawsuits are considered "parallel" when "substantially the same parties are contemporaneously litigating substantially the same issues in another forum." *Calvert Fire Ins. Co. v. Am. Mut. Reinsurance Co.*, 600 F.2d 1228, 1230 (7th Cir. 1979). In this case, the Plaintiff is the same party, and the Defendants are substantially the same (with the same Boone County defendant and only one individual, in her official capacity, added). Likewise, the issues are substantially the same. The facts and exhibits referenced in the state court case and this case are duplicative. In both cases, the Plaintiff alleges systemic racism has resulted in denial of temporary use permits (both cases) and a special use permit (state court case). Plaintiff relies upon alleged violations of the United States and/or Illinois Constitution and alleged civil rights violations protected by 42 U.S.C. § 1983 to support his claims in both cases.

If this court determines the actions are parallel, the district court must next consider the ten factors set forth in the Colorado River doctrine, namely: (1) whether the state has assumed jurisdiction over property; (2) the inconvenience of the federal forum; (3) the desirability of avoiding piecemeal litigation; (4) the order in which jurisdiction was obtained by the concurrent forums; (5) the source of governing law, state or federal; (6) the adequacy of state-court action to protect the federal plaintiff's rights; (7) the relative progress of state and federal proceedings; (8) the presence or absence of concurrent jurisdiction; (9) the availability of removal; and (10) the vexatious or contrived nature of the federal claim. *LaDuke v. Burlington N. R. Co.*, 879 F.2d 1556, 1559 (7th Cir. 1989).

No single factor is solely determinative, and the Seventh Circuit confirmed "the weight given to any particular factor will vary greatly from case to case, depending on the particular factual setting of the case at hand." *Id.*

In this case, the third, fourth, sixth, seventh, and tenth factors all weigh heavily in favor of this Court not exerting jurisdiction over this federal action. The state court case has been ongoing for over two years, with substantial progress made towards answering the seminal questions relating to whether Plaintiff has been targeted based on his race and denied due process as a result. Depositions have already been conducted and will be ongoing. The parties have already exchanged written discovery. The Plaintiff's rights can be adequately protected in sate court, and there was little reason to file this parallel action other than to attempt to exert additional pressure and create additional expense for the Defendants. Interjecting parallel litigation now risks dismantling, or at the very least stalling, the progress made in state court.

C.      **This case should be dismissed in its entirety for Failure to State a Cause of Action.**

While Count I does not specifically allege violations pursuant to 42 U.S.C. § 1983, it alleges a procedural due process violation by Boone County based upon the suspension on the ability of Plaintiff to obtain TUPs and seeks declaratory judgment regarding this issue. § 1983 provides a cause of action at law, in equity or in other proceedings for redress of constitutional violations. 42 U.S.C. § 1983 (West 2024). § 1983 provides the exclusive remedy for alleged violations of federal constitutional rights against units of local government. *Strauss v. City of Chicago*, 614 F. Supp. 9, 10 (N.D. Ill. 1984) ("Congress intended § 1983 to be the exclusive federal remedy for the unconstitutional actions of city officials."). Since the Supreme Court decided *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), "it has been clear that § 1983 provides a cause of action against municipalities and municipal employees acting in their official capacities, and courts accordingly have declined to allow direct constitutional claims against local governments." *Bieneman v. City of Chicago*, 662 F. Supp. 1297, 1299 (N.D. Ill. 1987). Additionally, a suit against an individual in their official capacity, such as here against Ms. Zimmerman, is deemed to be a suit against local governments. See *Kentucky v. Grahm*, 473 U.S. 159, 166 (1985) ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity").

Count II alleges a § 1983 claim based on procedural due process and equal protection claims in the suspension on the ability of Plaintiff to be issued TUPs. As such, Counts I and II require Plaintiff to plead sufficient facts to state a claim under § 1983. Plaintiff's allegations make clear his theories of § 1983 liability, as a deprivation of constitutional rights due to a product of a policy or custom of the local governmental unit. *Monell*, 436 U.S. at 690-91. A

claim under *Monell* requires a plaintiff to either "demonstrate: '(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Aku v. Chicago Bd. of Educ.*, 290 F. Supp. 3d, 852, 862 (N.D. Ill. 2017) (quoting *Waters v. City of Chicago*, 580 F.3d 575, 581 (7th Cir. 2009)). Allegations of particular instances and no factual support of "extensive systematic, discriminatory past practice" are insufficient to state a claim based on governmental policy or customs. *Barr v. Hardiman*, 583 F. Supp. 1, 4 (N.D. Ill. 1982).

Plaintiff argues that Boone County made decisions to suspend his ability to obtain TUPs based on mere conclusions that Boone County has a prejudice towards residents of Hispanic and Mexican descent. Plaintiff appears to attempt to provide factual support in an effort to establish a policy of Boone County by alleging general statements that Boone County has made TUPs for animal shows more restrictive, and also his experience with his TUP suspension, law enforcement and neighbors. These "facts" do not provide for a showing of a systematic policy or custom that Boone County is engaging in racial discrimination regarding animal shows as the allegations relate only to the instance of Plaintiff's suspension in obtaining TUPs for animal shows. While the courts have "not adopted any bright-line rules for establishing what constitutes a widespread custom or practice, it is clear that a single incident – or even three incidents – do not suffice." *Wilson v. Cook Cnty.*, 742 F.3d 775, 780 (7th Cir. 2014).

D.    **This Case Should be Dismissed as Time Barred.**

Dismissal under Rule 12(b)(6) for non-compliance with the statute of limitations "should be granted only where 'the allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense.'" *County of Cook v. Bank of America Corporation*, 181 F. Supp.

3d 513, 520 (N.D. Ill. 2015) (quoting *U.S. v. Lewis*, 411 F.3d 838, 842 (7th Cir. 2005)). This requires that the complaint itself "plainly reveal [] that [the] action is untimely under the governing statute of limitations." *Id.* (quoting *U.S. v. Lewis*, 411 F. 3d 838, 842 (7th Cir. 2005)).

As discussed above, Counts I and II are based on § 1983. The statute of limitations for claims under § 1983 is governed by state tort law. *Agbefe v. Bd. of Educ. of City of Chicago*, 538 F. Supp. 3d 833, 842 (N.D. Ill. 2021) (citing *Regains v. City of Chicago*, 918 F.3d 529, 533 (7th Cir. 2019)). In Illinois, the statute of limitations applied to § 1983 claims based on its state tort law is a period of two-years. *Id.* To be timely under the limitations period, the conduct giving rise to Plaintiff's claims under § 1983 must have occurred on or after September 6, 2022. *Id.* at 843. Only conduct alleged to have been continuing in nature may survive issues of statute of limitations, where such claims of violations of constitutional rights can be inferred from the complaint to have been ongoing within the two-year period. See *Id.* (finding Plaintiff's allegations of sex-based discrimination survive a motion to dismiss as the allegations stated that the discrimination was persistent and citing no end date allowing an inference in Plaintiff's favor that such discrimination continued to occur during the two-year period).

Plaintiff alleges specific instances of conduct that are not continuing in nature, which occurred prior to September 6, 2022. Compl. at ¶¶ 6-12. In doing so, Plaintiff even references specific dates in which an action occurred within paragraphs 6-12 of the Complaint. Plaintiff then realleges such paragraphs in Count I and Count II to incorporate the paragraphs into each respective count. Compl. at ¶¶ 50, 60. As such, Plaintiff includes actions within Counts I and II which are time barred based on the two-year statute of limitations and should be dismissed.

In the alternative, if the Court finds that the claim should not be dismissed, the paragraphs related to conduct on or before September 6, 2022, should be stricken from the

Complaint pursuant to Federal Rules of Civil Procedure Rule 12(f). Rule 12(f) allows the Court to "strike from a pleading an insufficient defense or any redundant, ***immaterial***, impertinent, or scandalous matter." Fed. R. Civ. Pro. 12(f) (West 2024) (emphasis added). Motions to strike are granted where "the allegations are so immaterial that they can have no possible bearing on the issues at trial and unless their presence in the complaint prejudices defendants." *U.S. Dental Inst. v. Am. Ass'n of Orthodontists*, 396 F. Supp. 565, 584 (N.D. Ill. 1975). Paragraphs 6-12 are immaterial, as they reference conduct that is barred by the statute of limitations and, as such, can have no bearing on issues at trial.

Plaintiff may attempt to describe these paragraphs as background information, however, background information relating to alleged specific instances of prior conduct is immaterial and prejudicial. See *Porter v. Int'l Bus. Machs. Corp.*, 21 F. Supp. 2d 829, 833 (N.D. Ill. 1998) (striking plaintiff's complaint of paragraphs as immaterial and prejudicial where paragraphs alleged instances of racial discrimination in years prior and were not included in an EEOC charge, of which the cause of actions were based only on the allegations of discrimination in the EEOC charge). However, Counts I and II request relief and attempt to state a cause of action based on specific alleged instances of conduct that occurred in July and August 2024. Paragraphs 6-12 of the Complaint relate to alleged specific instances of conduct from early 2022, of which the attempted causes of actions are not based.

### III.   CONCLUSION.

For the reasons stated herein, the claims against all Defendants should be dismissed for Plaintiff's failure to exhaust his administrative remedies, failure to satisfy the finality requirement, and his failure to state a claim for which relief can be granted. In the alternative,

this case should be stayed or dismissed pending resolution of Plaintiff's state court lawsuit

pursuant to *Colorado River Water Conservation District v. U.S.*, 424 U.S. 800 (1976).

Dated this 12th ay of September, 2024.

RENO & ZAHM LLP

By:  /s/ Michael G. Schultz
     Michael G. Schultz
     Attorney for Boone County, Illinois, and
     Diane Zimmerman, Defendants

Michael G. Schultz (#06297569)
Ryan T. Straw (#06297723)
Jeffrey H. Powell (#06297445)
RENO & ZAHM LLP
2902 McFarland Road, Suite 400
Rockford, IL 61107
(815) 987-4050
mgs@renozahm.com
rts@renozahm.com
jhp@renozahm.com

14

## <u>CERTIFICATE OF SERVICE</u>

I, the undersigned, hereby certify that on September 12, 2024, I caused to be electronically filed the aforesaid **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' 12(b)(6) MOTION TO DISMISS** with the Clerk of the above Court using the CM/ECF system, which will send electronic notification of such filing on the following attorneys:

Jamie A. Robinson (jr@brunolawus.com)
THE BRUNO LAW FIRM, LLC
205 N. Michigan Ave., Ste. 810
Chicago, Illinois 60601


/s/ Michael G. Schultz
Michael G. Schultz (#6297569)
RENO & ZAHM LLP
2902 McFarland Road, Suite 400
Rockford, IL 61107
(815) 987-4050
mgs@renozahm.com
*Attorneys for Defendants*

# EXHIBIT A

**From:** Jessica Roberts <jroberts@boonecountyil.gov>
**Sent:** Tuesday, September 3, 2024 10:48 AM
**To:** Jamie Robinson <jr@brunolawus.com>
**Cc:** Tricia Smith <tsmith@boonecountyil.gov>; Karla Maville <kmaville@boonecountyil.gov>; Ryan T. Straw <rts@renozahm.com>
**Subject:** RE: Nevarez Appeal

The appeal request will be published in the Thursday September 5, 2024 Boone County Journal circulation.  The Zoning Board meeting is scheduled for Tuesday September 24th at 7:00 p.m.

Thank you

**Jessica Roberts**
**Land Planner, Boone County**
www.boonecountyil.gov
1212 Logan Avenue Suite 102
Belvidere, IL 61008

p.815-547-6698 |
m. 815-520-2026|
jroberts@boonecountyil.gov

1

**From:** Jamie Robinson <jr@brunolawus.com>
**Sent:** Friday, August 30, 2024 4:24 PM
**To:** Jessica Roberts <jroberts@boonecountyil.gov>
**Cc:** Tricia Smith <tsmith@boonecountyil.gov>; Karla Maville <kmaville@boonecountyil.gov>; Ryan T. Straw <rts@renozahm.com>
**Subject:** Nevarez Appeal

This message originated from an **External Source**. DO NOT click links or open attachments unless you recognize the sender and know the content is safe.

Dear Ms. Roberts:

In accordance with your instructions and verification that you are the Zoning Administrator, please see the attached appeal of Mr. Nevarez and supporting documentation. Please let me know if there is anything else that we need to do. As stated in the attached appeal narrative, we have requested an expedited hearing as Mr. Nevarez has an event currently scheduled for September 15, 2024 for which he has made substantial arrangements.

Thank you for your prompt attention to this matter and have a nice holiday weekend.









Sincerely,

Jamie A. Robinson
THE **BRUNO** FIRM, LLC
205 N. Michigan Ave., Ste. 810
Chicago, IL 60601
Phone: (312) 321-6481
Direct: (312) 213-2230
*Email: jr@brunolawus.com*

# EXHIBIT B



# Boone County Planning Department

1212 LOGAN AVENUE, SUITE 102
BELVIDERE, ILLINOIS 61008
PHONE: (815)-547-6698 FAX: (815)-547-3579

## <u>APPLICATION FOR APPEAL</u>

Name of Applicant _Gustavo Nevarez_____

Mailing Address _942 cortney drive Carpentersville IL 60110 United States_____

Phone Number: Home _(847) 652-4131_____ Business _____

Decision Being Appealed:

_____The decisions being appealed are :_____
                      1. One year suspension of any TUP 's for Gustavo Nevarez
                      2. Revocation of Nevarez 's September 15 , 2024 TUP for an Animal Show Event.
_____

Date _8/30/2024_____      _____
                                              Applicant Signature

---

### (For Official Use Only)

Filing Date _____          ZBA Date_____

Date _____             _____
                                              Staff Signature

**NOTE:** Applications can be filed at anytime. Applications will not be processed until all of the required information has been submitted. See the attached schedule of meeting dates and deadlines for submittals.

**Gustavo Nevarez Appeal**
**August 30, 2024**

Dear Zoning Administrator and Zoning Board of Appeals:

Our firm represents Gustavo Nevarez. On August 26, 2024, Mr. Nevarez was sent a letter from Attorney Tricia Smith suspending his rights to have any temporary use permits for a year from August 4, 2024. Because Mr. Nevarez had already submitted an application for a TUP for his event on September 15, 2024, that permit process was terminated. A copy of the letter is attached hereto. The basis for the suspension and revocation was his alleged repeated violations of Section 4.2.3.A.1.c of the Zoning Ordinance on both July 6, 2024 and August 4, 2024. Section 4.2.3.A.1.c requires:

> c. *Participant Identification. All participants in the animal show/rodeo who interact with the animals must wear a clearly visible bib number on their back. This includes the competitors and the individuals responsible for moving the animals from place to place before, during, and after the event. The applicant and/or the property owner shall maintain a list of all such participants corresponding with their bib number and their contact information, and shall provide that list to the County upon request of the Zoning Enforcement Officer or State's Attorney's Office. This list must be kept by the applicant and/or the property owner for no less than three years after the date of the event.*

My client hereby submits his appeal of this decision to the Zoning Administrator and the ZBA in accordance with section 2.9 of the Boone County Zoning Code.

There are several reasons Mr. Nevarez is appealing this decision.

1. Mr. Nevarez has been trying to comply with the County's Zoning Ordinance. At his event on July 6, 2024, all of the event participants were wearing the same shirts so that they could be easily identified. All of the individuals working for the event were also wearing the same shirts so they could be identified. Pictures are attached hereto as IMG_0680.JPG (participants) and IMG_9688.jpg and IMG_employees.jpg and IMG_otheremployees.jpg (event workers) Upon information and belief, the only representative from the County who attended Mr. Nevarez's event and responsible for inspecting Mr. Nevarez's compliance with his TUP, was Sheriff Yunk. Sheriff Yunk was shown that all of the participants had matching shirts as did the event workers. After the event, on July 17, 2024, Attorney Maville sent an email to Diane Zimmerman which was forwarded to Mr. Nevarez. In that email, Attorney Maville directed Ms. Zimmerman to warn Mr. Nevarez that he was not in compliance with the TUP ordinance in that neither the participants nor the horses in the event had bib numbers. Attorney Maville stated in that email that "if this is not remedied, our office will file an ordinance violation next time" and also warned that future violations could result in suspension. A copy of the July 17, 2024 email is attached.

2. At Mr. Nevarez's August 4, 2024 event, in an effort to comply with the ordinance again, he had all of the horses tagged with numbers. Pictures of the tagged horses and the type of tag used are attached as IMG_0627.jpg and IMG_0630.PNG. When Sheriff Yunk appeared at the event to conduct his inspection, Mr. Nevarez showed him that all of his horses had identification numbers, except one. That tag was in the pocket shirt of the participant. At Mr. Nevarez's events, each horse has only one rider. Therefore, if the horses are identified, then the participants can also be identified. Sheriff Yunk did not indicate to my client that he was not in compliance with the TUP ordinance and indicated that as far as he was concerned the tags were sufficient. Therefore, my client believed that this was sufficient to comply with the Zoning Ordinance.

3. Following the August 4, 2024 event, Mr. Neveraz was never issued an ordinance violation. Accordingly, Mr. Nevarez applied for another TUP on August 16, 2024, for which he has been planning an event for September 15, 2024. On August 26, 2024, when Mr. Nevarez submitted the identity of the vet he would be using for the event, one of the final steps in obtaining a TUP, Mr. Nevarez was sent a letter from Attorney Smith indicating retrospectively that he will not be issued any TUPs after August 4 for a year due to his repeated violations of section 4.2.3.A.1.c even though he had already planned an event for September 15, 2024.

4. The purpose of Section 4.2.3.A.1.c is to ensure that the horses and individuals who ride them at horse shows can be identified. Why that is a requirement is entirely unclear, but it is notable that the County does not require a list of participants be disclosed BEFORE or AFTER the event. The County can request such list, but at neither my client's July 6th, nor the August 4th events, did the County request such information. Nor was Mr. Nevarez notified of any problems caused by any of the horses or the participants of either event.

5. Section 4.2.10 on the Zoning Ordinance allows the zoning enforcement officer:

> at any time prior to or during the period for which a permit has been issued, to revoke the permit if *it is determined that information is inaccurate or incomplete of which inaccuracy or omission substantially affects the event proposed or if the zoning enforcement officer becomes aware of information which they believe poses a serious threat to the health, welfare, security, or safety of any resident of Boone County or any other persons attending the event."*

> Violation of this code may result in, including but not limited to, denial or revocation of any future permits. The zoning enforcement officer reserves the right to revoke any future temporary use permits for a specified time, based on non-compliance with section 4.2.

It is clear that even if my client was not in full compliance with Section 4.2.3.A.1.c that there is no basis to refuse to issue his TUP permit for September 15, 2024 or to suspend his right to any further TUP's for a year.

- First, Mr. Nevarez was in substantial compliance with the Zoning Ordinance. If anything, this was a technical violation, which should not result in terminating a TUP already planned and applied for or suspending future TUP's.

- Second, Mr. Nevarez was **never** issued **any** ordinance violation as indicated would happen by the State's Attorney's office. Mr. Nevarez was only given a warning that a future violation would result in being issued an ordinance violation. Mr. Nevarez believed that he was in compliance with the ordinance at both his July 6 and August 4 events. It would be patently unfair to revoke Mr. Nevarez's right to have any TUP's for an entire year when the County never issued an ordinance violation explaining that what Mr. Nevarez was doing to try to comply with the ordinance was insufficient.

- Third, the wording of the Zoning Ordinance suggests that revocation or suspension is only appropriate if there is something incomplete or inaccurate about his application or if his non-compliance with this section of the ordinance substantially affects the event or poses a threat to someone. The wording of this section suggests that a far more serious violation must occur to suspend or to revoke a TUP.

- Fourth, the Zoning Enforcement Officer could have taken much less drastic action against my client. The Zoning Enforcement Officer could have issued a notice of violation. If the Zoning Enforcement officer was concerned about any specific participant or not satisfied that the participants were adequately identified, she could have requested a list of participants from my client, which she failed to do. There has been no reason stated in any of the correspondence to my client why his failure to comply 100% with this section of the Zoning Ordinance was so problematic that his right to any such permits would be revoked for a year. It was a **technical violation** that has harmed no one. My client advises me that he will have bibs with numbers for his event on September 15, 2024 as he now understands that is the only thing the County will accept from him.

- Fifth, the notice of suspension is unfairly and inexplicably retroactive and after my client put significant cost and effort into planning another TUP event for September 15, 2024. Because Mr. Nevarez was neither notified of an ordinance violation or of the suspension in a timely manner, (it was 22 days later) it would be unfair to refuse to allow Mr. Nevarez to go forward with his event on September 15, 2024.

- Finally, upon information and belief, participants at other shows also have not had participants with numbered bibs, but they have not been issued ordinance violations or had future TUP's suspended. For instance, at a show on April 13, 2024, at 289 Irene Road, Kirkland IL pictures were taken of these participants who are wearing ribbons, by no numbered bids. A copy of the picture taken is attached as IMG_0645.PNG.

Because of the late notice provided to my client, he is now precluded from obtaining a decision from the ZBA before his event. Accordingly, my client seeks expedited review of this matter.

If the County has any questions about this appeal, please contact me directly at either 312.213.2230 or jr@brunolawus.com

# EXHIBIT C

**From:** Gustavo Nevarez <g.nevarez0711@gmail.com>
**Sent:** Thursday, July 18, 2024 4:56 AM
**To:** Diane Zimmerman <dzimmerman@boonecountyil.gov>
**Subject:** Re: July 6, 2024 animal show - Spring Road

This message originated from an **External Source**. DO NOT click links or open attachments unless you recognize the sender and know the content is safe.

Good morning Mrs. Zimmerman ,

I would request the States attorney call me directly as all these complaints are a bunch of crap. I have proof that all of those complaints are 100% False just like I told the cops. If I keep getting threats from the county and the sheriffs that

1

come to my property from this county that my permits will be taken away for nonsense like that. The county will have an another lawsuit on there hands quick. GO AFTER DARA MOGENIS AND LEAVE ME ALONE.

Thank you always for your help Mrs. Zimmerman I'm sorry just venting. This message was directed to the States Attorney.
Sent from my iPhone


> On Jul 17, 2024, at 11:31 AM, Diane Zimmerman <dzimmerman@boonecountyil.gov> wrote:
>
>
> Good morning Gustavo,
> Please read the below comments from the State's Attorney's Office. It is imperative that the Animal Show zoning ordinance is followed. Continued violations may result in future denials of events.
>
> *Diane Zimmerman*
> Zoning Inspector
> Boone County Building Department
> 1212 Logan Ave  Suite 101
> Belvidere IL  61008
> Phone: 815-544-6176
> Fax: 815-547-0906
>
> PLEASE NOTE E-MAIL ADDRESS HAS BEEN CHANGED FROM .ORG TO .GOV
>
> dzimmerman@boonecountyil.gov
>
> **From:** Karla Maville <kmaville@boonecountyil.gov>
> **Sent:** Wednesday, July 17, 2024 11:14 AM
> **To:** Diane Zimmerman <dzimmerman@boonecountyil.gov>
> **Cc:** Tricia Smith <tsmith@boonecountyil.gov>
> **Subject:** July 6, 2024 animal show - Spring Road
>
> Hi Diane,
>
> After reading the police reports from the July 6, 2024 animal show at 10813 Spring Road, there were some issues that I believe you should address with the property owner. They do not rise to our office filing an ordinance violation at this time, but they may do so if repeated.
>
> 1. Lack of bib numbers. (This is the most important violation.) Neither participants nor those dealing with the animals were wearing bib numbers of any kind. If this is not remedied, our office will file an ordinance violation next time. Additionally, if there are further violations of this requirement, future temporary use permits may be denied.
> 2. Music continuing past 8:00 p.m. There were multiple reports that the music continued a little past 8:00 p.m. Please make sure the permit holder knows that 8:00 p.m. is the latest that the music should play.
> 3. Please remind the permit holder that there is a 50' setback from all right of ways and other property lines for "all sales areas, seating areas, activities, performance and event areas, and parking areas."
> 4. The event set-up should conform with the site plan on file with your department.
> 5. The music should only be playing during the duration of the animal show.

2

If you have any questions, please let me know.

Karla

Karla M. Maville
Boone County State's Attorney's Office
Civil Division
601 N. Main Street
Belvidere, IL  61008
p: (815) 544-0868
f: (815) 547-4847
kmaville@boonecountyil.gov

# EXHIBIT D

**IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT
BOONE COUNTY, ILLINOIS**

GUSTAVO NEVAREZ, JR., an individual,      )
                                          )
                    Plaintiff               )
      v.                                       )
BOONE COUNTY, ILLINOIS, a body politic and  )
corporate,                                    )  Case No. 2022MR4
                    Defendant.             )
                                         )

## THIRD AMENDED VERIFIED COMPLAINT

Plaintiff, Gustavo Nevarez, Jr. ("***Nevarez***" or "***Plaintiff***"), by and through his undersigned counsel, brings this Amended Verified Complaint against Boone County, Illinois ("***Boone County***" or the "***County***") and states as follows in support thereof:

## INTRODUCTION

1.     The Boone County Board ("***Board***") has engaged in a series of acts that not only violate County ordinances, but also constitute unconstitutional acts of discrimination aimed at the Hispanic community in Boone County. Nevarez, who is Hispanic and of Mexican descent, applied for and was denied a special use permit ("***SUP***") for an event space. However, during the last three years, the Board has approved special use permits for event spaces to two non-Hispanic, Caucasian applicants but has denied the same requested special use permits for two Hispanic applicants of Mexican descent, including Plaintiff, with no lawful justification for such denials.

2.     For over 20 years, the Hispanic community in Boone County enjoyed hosting up to 6 lawful animal shows a year on their properties, including charreadas - rodeos in which men, charros, and women wear traditional costumes and compete in charreia, a national sport in Mexico and referred to in the community as "***Hispanic Rodeos***". These events are permitted on their

properties pursuant to temporary use permits approved by the County under its prior zoning ordinance ("*Zoning Ordinance*"). Such events are similar to the American style rodeos that occur on the Boone County Fairgrounds as a grandfathered use.

3. During the course of the hearings on Nevarez's request for an SUP, he also applied for a temporary use permit for an animal show. The animal show had no relation to the event space requested in his SUP application.

4. Also during the course of the hearings, several complaints from primarily non-Hispanic property owners in Garden Prairie were made about the Hispanic Rodeos and not geared towards the event space requested by Nevarez. Nevarez's SUP application was ultimately denied.

5. In addition, due to the myriad of complaints of property owners, some of whom do not even reside on their properties, and whose properties are not in proximity of any of the properties hosting Hispanic Rodeos, on Thursday, May 5, 2022, the Board, without proper notice and without a public hearing, approved Resolution 22-29, titled *A Resolution Adopting a 60 Day Temporary Moratorium On Issuing Temporary Use Permits And A Revocation Of Previously Approved Temporary Use For Animal Shows* ("*Resolution 22-29*").

6. Resolution 22-29: (i) temporarily banned animal shows, a temporary use under Sections 4.2.2 and 4.2.5 of the County's former Zoning Ordinance; (ii) prohibited the County's Zoning Enforcement Officer from approving any such pending permits, regardless of whether those applications are otherwise entitled to be approved under the current Zoning Ordinance; and (iii) automatically revoked any temporary use permits already issued.

7. Both the denial of Nevarez's SUP application and Resolution 22-29 are violative of Nevarez's substantive and procedural due process and equal protection rights and are based primarily on community members' and the Board members' animus towards Nevarez as a

Hispanic of Mexican descent and towards the Hispanic/Latino community generally. Such blatant discriminatory acts should not be countenanced and should be declared invalid.

## PARTIES AND JURISDICTION

8.      Plaintiff, Gustavo Nevarez Jr., is an Illinois resident who resides at 942 Courtney Drive, Carpentersville, Illinois. He is the owner of the real property located at 10813 Spring Road in Boone County, Illinois (the "***Property***").

9.      Defendant Boone County is a non-home rule body politic organized under the Illinois Counties Code, 55 ILCS 5/5 *et seq.,* with its principal place of business at 1212 Logan Ave., Suite 102 Belvidere, IL 61008.

10.      Jurisdiction over the County is appropriate in Illinois pursuant to 735 ILCS 5/2-209(a)(1-2), and 2-209(b)(3-4) because the County transacts business within Illinois, committed tortious acts in Illinois and is organized under the laws of Illinois.

11.      Venue is appropriate in Boone County pursuant to 735 ILCS 5/2-101 and 5/2-103 because the facts giving rise to the causes of action asserted in this Complaint took place in Boone County, Illinois, the County Board is located in Boone County, Illinois and this lawsuit concerns real property located in Boone County, Illinois.

## BACKGROUND FACTS

### THE SUP APPLICATION

12.      On October 13, 2021, Nevarez purchased the Property, a 20.5-acre parcel of A-1 zoned land in unincorporated Boone County, to develop an indoor and outdoor event space for weddings and other events. The northeast corner of the Property currently has two occupied residences, a 24-horse stable and 4 accessory barns. Approximately 18 acres of the Property is active tillable farmland. An aerial photograph of the Property is attached as Ex. 1.

13.    Before Nevarez purchased the Property, the County's Planning Department informed him that this use would qualify for an SUP as either a small business or an assembly hall. Excerpts from the Zoning Ordinance are attached as Ex. 5.

14.    The property surrounding the Nevarez Property is predominantly zoned A-1.  A zoning map of the area is attached as Ex. 2.  Only one 10.8-acre parcel on the northeast side of the Property is zoned residential R-1.  Ex. 2.  The other seven adjacent properties are zoned A-1. Ex. 2. There is one parcel north of the Property that is zoned I-1.  That parcel houses a grain storage and distribution facility that is in operation seven days a week.  Exs. 1-2. The other uses in the area in proximity to the Property are predominantly agricultural, including equestrian facilities and a hunting preserve.  The residential uses in the area are mostly farmhouses, which are accessory to the property's primary use as agricultural.  Exs. 1-2.

15.    In early March 2022, Nevarez applied for an SUP for a small business and assembly hall.  The SUP application and site plan are attached as Ex. 3.

16.    On March 15, 2022, the Boone County Regional Planning Commission ("***Planning Commission***") held a public hearing on the SUP application.  Although several people, mostly from Garden Prairie, objected to the use, the Planning Commission voted unanimously in favor of the SUP application and recommended approval to the Zoning Board of Appeals ("***ZBA***").  A copy of the Advisory Report for Zoning Board of Appeals is attached as Ex. 4.

17.    In support of their findings, the Planning Commission examined the special use criteria set forth in Section 2.7.3 of the Zoning Ordinance.  Ex. 5.

18.    Specifically, the Planning Commission found that Nevarez's proposed event space provides a necessary service to the area and would not have a substantial adverse effect upon adjacent property, the character of the neighborhood, traffic conditions, utility facilities and other

matters affecting the public health, safety and general welfare, in part because the site has two access roads that can handle higher levels of traffic. Ex. 4.

19.     In addition, the Planning Commission found that the central location of the use on the Property coupled with several existing structures on the northeast side of the Property would sufficiently buffer the use from surrounding properties. Ex. 4. To mitigate any potential adverse impacts, the Planning Commission made 10 recommendations requiring:

a.  Any outdoor lighting used to illuminate the event space shall be directed down and away from all adjacent property and roadways and shall not exceed one foot-candle at any property line. The applicant is responsible for hiring a contractor to perform tests to confirm that the lighting is within the limit.

b.  Before the use is established, a parking lot site plan be provided to the Planning Department for review;

c.  60% of landscaping shall be provided along the parking lot frontage, to a minimum height of three feet.

d.  Parking to be provided in accordance with the Illinois Accessibility Code and Section 5.5.4 of the Zoning Ordinance;

e.  A setback of 200 feet to be maintained from the west and south sides of the Property;

f.  A full site plan review and approval by all appropriate agencies in the event of new construction or remodeling;

g.  Application of Illinois drainage laws;

h.  Outdoor events to begin after approval in compliance with the site plan;

i.  Indoor events to begin at the completion of building and zoning permits within 36 months; and

j.  Compliance with all other applicable local, state and federal laws, rules, and regulations, including Noise Ordinance 17-19.

Ex. 4.

20.     On March 22, 2022, the ZBA held a public hearing on Nevarez's SUP application. Many of the same Boone County residents testified and submitted letters against the SUP

application complaining, without credible evidence, that the event space would negatively impact surrounding property values. A 3/21/22 letter from Dickerson & Nieman Realtors is attached as Ex. 6. The realtor commissioned by Nevarez's next-door neighbor submitted a report on *The Impact of Noise on Residential Property Value*, which is wholly inapplicable because the property surrounding the Nevarez Property is A-1, not residential, and the study focused on airplane, train and road noises in major metropolitan areas. The 3/22/22 letter and report are attached as Ex. 7.

21.     One complaint came from an adjacent farmland with no existing residence. The property owner asserted that "re-zoning this property into a commercial property will adversely affect both my working farm property and my family in the future," because of the "inability . . . to build a home on it in the future." Copies of opposition letters are attached as Ex. 8. Nevarez was not seeking a rezoning.

22.     Surprisingly, the managers of the grain storage and distribution facility also objected because they alleged any traffic in addition to their daily 20-30 truck loads might be a safety concern for their drivers.   Ex. 8.

23.     One of the letters was troubling based on its disapproval of this use because "we have already tolerate[sic] the noise and loud music from the 2 Hispanic rodeos on Shattuck Rd. & Carlson Rd." Ex. 8.

24.     Based on the objections, it appears the objectors were conflating Nevarez's SUP application with his request for a temporary use permit for an animal show. However, the SUP requested by Nevarez would not allow animal shows. Ex. 2. Nevertheless, even the Chairman of the Planning Commission submitted a letter in opposition to the SUP application to the ZBA after approving the SUP application stating:

> So on that note, last week a Special Use Permit Applicant requested that they could apply for a birthday/wedding venue on their farm.  So the board and myself all

agreed to vote in favor of said request, again in effort to maintain a healthy level of growth. *However it was after the meeting that a former colleague showed me a picture of a flyer that was already promoting a rodeo event, complete with beverages and bands...But on that note, I wish I had that information prior to my vote.*

A copy of the 3/21/22 letter from Philip Newhouse is attached as Ex. 9 (emphasis provided).

25.     On March 22, 2022, the ZBA added certain conditions to the SUP, including not allowing outdoor tent events and limiting noise to five (5) decibels at the property line - less than a whisper.   A copy of the Committee of the Whole Administration is attached as Ex. 10. Regardless of the suggested amendments, the ZBA voted against the SUP application.

26.     At the Board's first meeting on the SUP application, April 7, a number of residents made public comments about the problems associated with Hispanic Rodeos unrelated to the SUP application, such as loud music, drunk driving and parking on county roads.   The Board polled its members and all but two indicated their intent to vote against the SUP application, despite it not allowing for any animal shows or rodeos.

27.     At the final Board meeting on April 21, 2022, several members of the public spoke out against Hispanic Rodeos; not weddings or birthday parties.   That evening, the Board denied the SUP application.   A copy of the letter denying the SUP application is attached as Ex. 16.

28.     The Board has vociferously denied any allegations of discrimination, yet one of the Board members threatened to throw out a Hispanic member of the public at the meeting that evening because the Board member was being looked at in a way he did not like.

29.     Upon information and belief, one of the Board members, a retired lawyer, has been covertly advising the complaining neighbors on how to legally attack both Plaintiff's SUP application and animal shows/rodeos generally.

30. Nevarez's next-door neighbor created an elaborate PowerPoint presentation in opposition to Nevarez's SUP application that appears to have been prepared by an attorney or other professional with substantial knowledge of the County's zoning process and resources. Many of the concerns raised therein are about County resources available to police events and ensure compliance with the County's codes. A copy of the PowerPoint presentation is attached as Ex. 11.

31. The presentation purposely conflates Nevarez's SUP application with rodeos and attaches a flyer related to an animal show Nevarez had applied for separately. It is titled "Important Consideration." It appears this was done to stir up hostility against Nevarez and his SUP application, even though the two have nothing to do with each other. Ex. 11.

## THE NEVAREZ ANIMAL SHOW APPLICATION, APPEAL AND EVENT

32. On March 8, 2022, Nevarez applied for a temporary use permit to host an animal show on the Property, Saturday, April 30, 2022 (the "*TUP*"). Ex. 12.

33. Section 4.2.2 of the prior Zoning Ordinance governs temporary use permits for certain enumerated events provided all criteria are met. Ex. 5. Section 4.2.3 allows a temporary use permit for "Animal Shows", which encompasses the Hispanic Rodeos Ex. 5. Pursuant to Section 4.2.5 of the Zoning Ordinance, the Zoning Enforcement Officer reviewing the application has no discretion on whether to issue the permit if all criteria are met and the appliable departments have approved the request. Ex. 5.

34. Section 4.2.5(F) also provides that "[t]he zoning enforcement officer shall have the authority to deny a temporary use permit if the applicant has a demonstrated and documented failure to comply with the regulations of a similar previously granted temporary use." Ex. 5.

35. Many Hispanic/Latino Boone County residents have been applying for and obtaining these temporary use permits since at least 2011 when the current Zoning Ordinance was

amended. The Hispanic Rodeos are, in part, an effort to preserve part of their Mexican heritage in an otherwise predominantly non-Hispanic, Caucasian area.

36. Upon information and belief, in the last 10 years, there have only been two Hispanic Rodeos upon which formal complaints were made to the County. However, since the beginning of 2022, several residents have come forward in opposition to the Hispanic Rodeos citing noise, underage drinking, animal cruelty, traffic and parking concerns.

37. The County recently changed its permitting process to an online system and Nevarez was the first application processed under the new system.

38. The Zoning Enforcement Officer accidentally approved Nevarez's SUP application the same day it was submitted although the application had not yet been approved by the required departments. Accordingly, she contacted Nevarez and told him that she would be in touch after the requisite approvals were obtained.

39. Nevarez was never informed that he needed to supplement his application in any way with additional information in order to obtain the approvals necessary for the event.

40. On March 21, 2022, Nevarez was informed that his event was officially approved.

41. On April 8, 2022, after submitting a FOIA request to the County, the neighbor next door to the Property appealed the decision to grant the TUP application.

42. In a very orchestrated way, 36 other property owners, primarily in Garden Prairie, also submitted appeals the same day.

43. Although Nevarez had never held an animal show on his Property, his TUP application did not concern his SUP application, and the appeal challenged *the process* of how the TUP was issued by the Zoning Enforcement Officer, five of the letters in opposition to the TUP

application were the exact same letters that were submitted in opposition to Nevarez's SUP application but with different dates. Example letters are attached as Ex. 13. Compare Ex. 8.

44.     On April 26, 2022, the appeal was heard before the ZBA. Based on the testimony of the Zoning Enforcement Officer, the ZBA upheld the issuance of the permit and Nevarez went forward with the animal show on April 30, 2022.

45.     Nevarez's event showcased horses specifically trained to dance to music – it was not a rodeo. Nevarez obtained a beer and wine liquor license; carded and issued wristbands for people drinking alcohol; and security confiscated alcohol from anyone trying to bring in their own. The Boone County police and Department of Health were at the event for a period of time and had no complaints. The music stopped by 8:00 p.m. and the event was over by 9:00 p.m.

46.     Upon information and belief, there were no complaints for noise violations, parking or traffic concerns, drunk driving or underage drinking. Nevarez was not cited with any ordinance violations. Police stationed outside of the event began pulling people over when the event ended. Upon information and belief, no one was cited or arrested for driving under the influence.

47.     On or about May 2, 2022, Nevarez applied for five additional TUPs for animal shows on the following dates: May 21, 2022, June 18, 2022, July 16, 2022, August 20, 2022, and September 17, 2022. Copies of the applications are attached as Ex. 14.

**THE ANIMAL SHOW MORATORIUM**

48.     During the Board's April 21, 2022 regular meeting, the Chairman of the Board indicated the Board's intent to pass a moratorium on all animal shows for a period of 60 days and appoint a committee to look into the issues associated with the animal shows and amend the Zoning Ordinance accordingly.

49.     Despite not being on the agenda, several people made comments both for and against Hispanic Rodeos.  Many property owners in the Hispanic/Latino community who have been hosting these events for several years without problem implored the Board to consider the economic impact on them, the businesses that serve them, and their ability to engage in activities that are part of their Mexican heritage.

50.     Section 4.2.3 of the prior Zoning Ordinance allows a property owner up to six TUPs a year.  Ex. 5. The vast majority of the animal shows have gone forward without complaint, ordinance violations, or non-compliance with the TUPs.

51.     The only people to make any public comments on the moratorium were against the moratorium.  No one spoke in favor of the moratorium except the Board members.

52.     On May 5, 2022, at a special meeting and without the opportunity of anyone, including those with applications pending, to present evidence or cross examine witnesses in support of their applications, the Board adopted Resolution 22-29, which put a temporary moratorium on all animal shows, prohibited the Zoning Enforcement Officer from issuing any new permits and revoked any permits for events occurring in the 60-day moratorium period.  A copy of Resolution 22-29 is attached as Ex. 15.

53.     Resolution 22-29 allowed the moratorium to be continuously renewed for additional 30-day increments based on no set criteria.

54.     Upon information and belief, the Board ignored their Zoning Ordinance and adopted Resolution 22-29 because it feared that more damning information would be exposed if there was an official public hearing on the issue.

55.     Resolution 22-29 did not affect the rodeos that take place at the Boone County Fairgrounds, which are referred to as "American" rodeos, and attended and run primarily by non-

Hispanic Caucasians, because the County asserts such events have been grandfathered in by the County's most recent Zoning Ordinance adopted in 2011.

56.     On May 17, 2022, Plaintiff filed his Verified Complaint and Motion for Mandatory Injunction seeking to strike down the illegal moratorium and an order compelling the County to process Nevarez's remaining 5 applications for animal shows.

57.     Plaintiff was unable to obtain a court date on his emergency motion until June 9, 2022, which is the date the County scheduled a special Board meeting to discuss any recommended changes to the Zoning Ordinance as it pertains to temporary use permits.

58.     It is clear that the neighboring residents wanted to shut down any ability of the Hispanic/Latino residents to host animal shows in the County and that the County was poised to provide such relief to the neighboring residents until the County was sued.

59.     To the credit of the ad hoc committee, it worked expeditiously to amend the Zoning Ordinance so that it would have something to present to the Board for a vote by June 9, 2022.

60.     The amended Zoning Ordinance as initially presented to the ZBA essentially tightened up some of the existing procedures, changed the hours of operation for the shows to accommodate noise complaints, increased property line setbacks and required 21 days between each show on a given property.

61.     The ZBA, after discussion at their meeting, amended the Zoning Ordinance further by only allowing a property owner four events per year instead of the six previously granted.

62.     At the Board meeting on June 9, 2022, there were substantial complaints made by Garden Prairie residents that the amendments were not enough to appease their concerns.  In a last minute attempt to gut the amended provisions, one Board member, supported by at least one and often two other Board members, moved to entirely eradicate the rodeos, completely prohibit all

alcohol at such shows, prohibit any live music at such shows or alternatively set a noise limit on such events. The County had to be continuously reminded by its special counsel that any such bans had to be rationally based and there would have to be justification for treating this temporary use differently from the other temporary uses identified in the Zoning Ordinance, such as a carnival, circus, festival or an outdoor music/entertainment event. Ex. 5, 4.2.3(C), (F) and (J).

63. Despite several Board members' desire to eradicate the charreadas entirely, the bulk of the requested changes by this Board member were ultimately rejected.

64. On June 9, 2022, the Board adopted the amended Zoning Ordinance ("Amended Zoning Ordinance") and lifted the moratorium effective June 14, 2022 – not coincidentally, the same day another hearing was scheduled on the Motion for mandatory injunction.

65. Due to the delay in being able to have a hearing on Nevarez's Motion, two of the dates requested by Plaintiff in his original applications to the County had already passed or would be impossible to coordinate on such short notice. Thus, Nevarez withdrew his Motion.

66. However, since that time, Nevarez has been informed by multiple people affiliated with the County that from here on out, because Nevarez decided to sue the County, he would continue to have trouble getting approvals for events and likely have other issues with the County.

67. Nevarez's next-door neighbor continues to object to anything Nevarez does on the Property and is constantly calling the County to complain. The latest complaint was that Nevarez was doing work on his Property without a permit. Upon information and belief, the neighboring property owner is using drones to spy on Nevarez. Nevarez, however, was simply clearing debris from a dilapidated building that was damaged in a recent storm for which no permit was needed. Upon information and belief, the next-door neighbor also plans to object to any future temporary use permits requested by Nevarez. Moreover, upon information and belief, this neighbor is still

being assisted by at least one member of the Board, if not more so, to arrange for the County to

reconsider the Amended Zoning Ordinance after this year's charreada season.

## COUNT I
### (Declaratory Judgment Pursuant to 55 ILCS 5/5-12012.1(a)
### Violation of Plaintiff's Substantive Due Process Rights Under Illinois Constitution (SUP))

68.     Plaintiff realleges the allegations contained in paragraphs 1-67 as though fully

contained in this paragraph.

69.     At all relevant times, Nevarez was the owner and operator of the real estate located

at 10813 Spring Rd., Garden Prairie, in Boone County, Illinois.

70.     55 ILCS 5/5-12012.1(a) provides that:

Any decision by the county board of any county, home rule or non-home rule, in
regard to any petition or application for a special use, variance, rezoning, or other
amendment to a zoning ordinance shall be subject to de novo judicial review as a
legislative decision, regardless of whether the process in relation thereto is
considered administrative for other purposes. Any action seeking the judicial
review of such a decision shall be commenced not later than 90 days after the date
of the decision.

71.     Article 1, § 2 of the Illinois Constitution provides that "[n]o person shall be

deprived of life, liberty or property without due process of law nor be denied the equal protection

of the laws."

72.     A due process violation can be procedural or substantive. The Board's decision to

deny Nevarez's SUP application was a final decision, which was arbitrary and capricious and

violative of Nevarez's substantive due process rights to use his Property in a manner allowed by

law.

73.     In accordance with 735 ILCS 5/2-701, there is an actual, justiciable controversy as

to whether the denial of the SUP application violated Nevarez's substantive due process rights.

74.     The Planning Commission recommended to the ZBA that the County grant Nevarez's request for a special use permit subject to several conditions designed to mitigate any potential negative impacts on surrounding property owners. The bulk of complaints submitted to the ZBA were associated with Hispanic Rodeos, not event spaces. The Planning Commission specifically found that the SUP permit application met all of the conditions set forth in the Zoning Ordinance for a special use including findings that:

a)  The proposed structure or use at the particular location requested is necessary or desirable to provide a service or facility which is in the interest of the public and will contribute to the general welfare of the neighborhood or community;

b)  The proposed structure or use will not have a substantial adverse effect upon the adjacent property, the character of the neighborhood, traffic conditions, utility facilities and other matters affecting the public health;

c)  The proposed structure or use will be designed, arranged and operated so as to permit the development and use of neighboring property in accordance with the applicable district regulation and the proposed use is not anticipated to have any effects on surrounding uses;

d)  Such other standards and criteria as established by the ordinance for a Special Use as set forth in section 2.7.4 and as applied to Planned Developments as set forth in section 2.10 shall apply to the property for as long as the Special Use Permit is in effect;

e)  That the Special Use shall in all other respects conform to the applicable regulations of the district in which it is located, except as such regulations may in each instance be modified by the County Board pursuant to the recommendations of the Zoning Boards of Appeals; and

f)  That the potential public benefits of the Special Use outweigh any potential adverse impacts of the Special Use after taking into consideration the Applicant's proposal and any requirement recommended by the Applicant to ameliorate such impacts.

See Ex. 4, pp. 3-4.

75.     Despite the Planning Commission's recommendation to the ZBA, the ZBA and the Board denied the SUP application.

76.     At the public hearing before the ZBA and the public meetings before the Board, the neighboring residents, the ZBA and the Board conflated Hispanic Rodeos with the Nevarez SUP application. There was no discussion or assertion that Nevarez failed to meet any of the requirements for a special use other than the potential adverse impact on surrounding property owners, which appears to have been based on the belief that the Nevarez SUP application allowed for rodeos. The complaints were not substantiated by anyone who actually lives near an event space, like that involved in the SUP, but rather near property owners who host Hispanic Rodeos.

77.     One of the primary concerns of the Board members about the Nevarez SUP application was that there was not enough information provided in the application to be able to determine if some of the special use criteria was met, but the Board had ample opportunity to ask any questions of the applicant they wished and also had an opportunity to send the application back to the ZBA so that additional information could be obtained or more stringent requirements imposed to address some of the concerns of community members.

78.     The Board was also concerned about the impact on neighboring property owners, but again, those concerns were predicated on complaints about Hispanic Rodeos and not whether weddings or similar events would have the same impact. There was no credible evidence submitted to the Planning Commission that weddings or other similar events would cause the same problems raised about Hispanic Rodeos or cause a reduction in surrounding property values.

79.     In Illinois, the constitutionality of land use ordinances is determined in part under a set of factors known as the *LaSalle/Sinclair* factors. The *LaSalle/Sinclair* factors are: (1) the existing uses and zoning of nearby property; (2) the extent to which property values are diminished by the particular zoning restrictions; (3) the extent to which diminishing the Plaintiffs' property value promotes the health, safety, morals, or general welfare of the public; (4) the relative gain to

the public compared to the hardship imposed upon the individual property owner; (5) the suitability of the subject property for the zoned purpose; (6) the length of time the property has remained vacant as zoned in the context of land development in the vicinity; (7) community need for the proposed use; and (8) the care with which the community has undertaken to plan its land use development.

80.     The first, and most important factor, is in favor of Nevarez. The A-1 zoning of the Property is the same as the A-1 zoning of the properties bordering 3 1/2 sides of the Property. The only property adjacent to the Property that is not zoned A-1 is zoned R-1, but there is a large buffer between where the proposed use will be and that property. Also, just north of the Property is a grain facility that is zoned I-1.

81.     The use of the surrounding properties varies. There is another home located on property directly east of the property zoned A-1, which is also being farmed and will also be buffered by the existing buildings. Directly south is farmland with no residence. To the west is also farmland with a residence and west of that is a horse stable and outdoor arena. To the southeast of the Property is a hunting preserve, to the west is a horse stable and arena and to the north is farmland and beyond that the grain storage and distribution facility.

82.     Assembly halls and small businesses are special uses in the A-1 zoning district; thus, the County has already made a legislative determination that these uses are compatible with agriculturally zoned properties provided that consideration be given to any special impacts that the use may have at specific locations on surrounding property. Ex. 5.

83.     The second factor is also in favor of the Nevarez. Nevarez's Property is diminished in value by not being allowed to develop it in the manner prescribed by the Zoning Ordinance.

84.     The third factor is also in favor of the Nevarez. Diminishing Nevarez's Property value does not promote the health, safety, morals, or general welfare of the public. There is no evidence that an event space that hosts weddings and birthdays would be a detriment to the public health. An increase in traffic is not dangerous unless shown that the roads and current conditions cannot handle it, which has not been demonstrated. The surrounding property owners' fears that the event space is going to dimmish their property values is totally unfounded, particularly when there is a grain storage and distribution facility next door to them. The complaints that the events will cause pollution, noise, trespassing and other damage to surrounding property are similarly wholly speculative and can be addressed through the County's other ordinances.

85.     For these same reasons, there is no gain to the public by refusing to allow Nevarez to have an event space on the Property, and, thus, the fourth factor is also in favor of Nevarez. Conversely, because there is no gain to the public by denying the SUP application, it cannot be said to outweigh the hardship that is imposed on Nevarez by not being able to make full use of his Property.

86.     The Property is zoned A-1 and small businesses and assembly halls are special uses in the A-1 zoning district; thus, the Property is suitable for a small business and assembly hall. Therefore, the fifth factor is in favor of Nevarez.

87.     The sixth factor is neutral because the Property is not and has not been vacant. It has been operating as a horse boarding stable and tillable farmland.

88.     There is a need for this use in the community in support of the seventh factor. Upon information and belief, there is no currently operational event space for weddings in rural Boone County. Other event spaces are located within the townships, but do not have the capacity for weddings or other large events. Boone County has a population of over 53,000 people. Although

two other event spaces in rural Boone County have been granted special uses in the last few years, upon information and belief, those spaces are still not fully operational, and Nevarez has already been asked by several people in the area when the event space is expected to open. Given that COVID-19 has caused so many people to postpone large events, there is an exceptionally high demand for event space at this time.

89.     The County's Comprehensive Plan, adopted in 2019, also supports allowing Nevarez this use. In Chapter 7: Economic Development, the County states "the economic development strategy for the county...must grow the job base within commuting distance and make the region attractive for workers to move to and stay within." *See* Boone County, Illinois, Boone County Comprehensive Plan 2029, p. 69 (2019), *available at* https://www.boonecountyil.gov/government/departments/planning_department/boone_county_c omprehensive_plan.php (last accessed Jan. 10, 2023). Two of the County's economic goals are to "[e]xpand existing businesses and become a more business-friendly county" and to "[a]ttract new businesses and diversify the economy." *Id.*, pp. 74-75. In particular, the Plan calls for the County to "[a]ssist the Latinx and Hispanic community and other underrepresented groups in building and developing small businesses." *Id.*, p. 81. In accordance with the Comprehensive Plan, the Property will have an event space, but a large portion of the Property will continue to be actively farmed, preserving the agricultural nature of the area.

90.     Additionally, the County has a recent history of granting other special use permits for event space. As examples, in 2019, the Board approved a similar SUP for an event space at 798 Wyman School Road in Caledonia, IL to Joann Swenson and another one to Therese Laub at 5249 Stone Quarry Road Belvidere, IL.

WHEREFORE, Plaintiff, Gustavo Nevarez, respectfully requests:

a)  that this Court declare the decision of the County Board in denying the Nevarez SUP application arbitrary and capricious, unconstitutional and violative of Plaintiff's substantive due process rights;

b)  that Plaintiff be allowed to operate his Property in the manner set forth in the SUP application subject to the conditions recommended by the Planning Commission;

c)  that a permanent injunction be issued against the County preventing it from interfering with Plaintiff's use of his land as set forth in the SUP; and

d)  for any further relief that this Court deems just.

## COUNT II
### (Declaratory Judgment – Violation of Equal Protection Clause of Illinois Constitution (SUP))

91.     Plaintiff realleges the allegations contained in paragraphs 1-67 as though fully contained in this paragraph.

92.     Article I, § 2 of the Illinois Constitution provides that "[n]o person shall be deprived of life, liberty or property without due process of law nor be denied the equal protection of the laws."

93.     The County's denial of the SUP application violates the Illinois Constitution's equal protection clause which requires government to govern impartially and to not draw distinctions between individuals solely on differences that are irrelevant to a legitimate governmental objective.

94.     Nevarez is in a protected class as a Hispanic individual of Mexican descent. Nevarez is similarly situated to the Caucasian applicants who applied for SUPs in 2019 for indoor/outdoor event spaces in the A-1 district in Boone County. Specifically, in 2019, the Board approved a similar SUP for an event space at 798 Wyman School Road in Caledonia, IL to Joann

Swenson and another one to Therese Laub at 5249 Stone Quarry Road Belvidere, IL, both Caucasians. The County's application of its Zoning Ordinance to deny Nevarez's SUP application was predicated on Nevarez's protected class. He is being treated differently than the non-Hispanic, Caucasian applicants for the same use based on his ethnicity.

95.     The County is unequally applying its Zoning Ordinance based on its own prejudices and the unfounded fears of neighboring residents because Nevarez is Hispanic and of Mexican descent.

96.     The Board's actions have irreparably harmed Nevarez in that he is unable to use his Property in a way that is allowed by the County's Zoning Ordinance based on his ethnicity.

97.     In accordance with 735 ILCS 5/2-701, there is an actual, justiciable controversy as to whether the County's denial of the SUP application is violative of Nevarez's equal protection rights under the Illinois Constitution.

WHEREFORE, Plaintiff, Gustavo Nevarez, respectfully requests that this Court:

a)  declare the decision of the County Board to be unconstitutional as violative of Nevarez's right to equal protection under the Illinois Constitution;

b)  declare that the Plaintiff be allowed to operate his Property in the manner set forth in the SUP application subject to the conditions recommended by the Planning Commission;

c)  issue a permanent injunction against the County preventing it from interfering with Plaintiff's use of his land as set forth in the SUP; and

d)  for any further relief that this Court deems just.

**COUNT III**
**(Declaratory Judgment – Invalidity of Resolution 22-29 as Violative of Enabling Statute**
**and the County's Zoning Ordinance – Replead for Purposes of Appeal Only)**

98.     Plaintiff realleges the allegations contained in paragraphs 1-67 as though fully contained in this paragraph.

99.     Boone County is not a home rule County; as such, it only has the authority as provided to it under Illinois law.

100.     The Illinois Counties Code allows counties to pass ordinances and resolutions to implement restrictions on the use of land. *See* 55 ILCS 5/5-12001, *et seq.*

101.     55 ILCS 5/5-12007 provides that a County may create a zoning commission to draft ordinances or resolutions to effect zoning. However, that section specifically provides that:

> After the preparation of such tentative report and ordinance or resolution, the commission ***shall hold hearings thereon and shall afford persons interested an opportunity to be heard. A hearing shall be held in each township or road district affected by the terms of such proposed ordinance or resolution.*** Notice of each hearing shall be published at least 15 days in advance thereof in a newspaper of general circulation published in the township or road district in which such property is located. If no newspaper is published in such township or road district, then such notice shall be published in a newspaper of general circulation published in the county and having circulation where such property is located. Such notice shall state the time and place of the hearing and the place where copies of the proposed ordinance or resolution will be accessible for examination by interested parties.
>
> *     *     *
>
> Within 30 days after the final adjournment of such hearings the commission shall make a final report and submit a proposed ordinance or resolution to the county board.

55 ILCS 5/5-12007 (emphasis provided).

102.     Temporary use permits may be obtained for animal shows under the County's Zoning Ordinance. The County's Zoning Ordinance, however, does not provide a way to suspend such a use. Section 2.10.1 of the County's Zoning Ordinance, which applies to text amendments to the Zoning Ordinance, requires notice and a public hearing.

103.    There was no public hearing on Resolution 22-29 in accordance with either 55 ILCS 5/5-12007 or with Section 2.10.1 of the Zoning Ordinance.

104.    On April 21, 2022, at a regularly scheduled Board meeting, the Board announced its intent to pass a moratorium on animal shows. It was not on the agenda, and there was no notice published about this topic being raised at the meeting. The Board also announced that it would be taking action on the moratorium at the special Board meeting scheduled for May 5, 2022.

105.    A public meeting is not a public hearing. While members of the public were allowed to provide public comments at both the April 21, 2022 and May 5, 2022 meetings, the County did not properly notice interested parties and did not hold a public hearing where such interested parties could present evidence and cross-examine witnesses.

106.    Nor was there a recommendation from the Planning Commission to the ZBA or Board on the issue. The Board summarily acted, cutting both the Planning Commission and the ZBA out of the process in violation of Illinois law and its own Zoning Ordinance.

107.    Nevarez submitted five additional permits for similar horse shows on May 2, 2022. Two of the shows were for dates within the 60-day moratorium and which were pending with the Zoning Officer before the moratorium was passed.

108.    The moratorium was lifted after two of the dates requested by Nevarez had passed.

109.    In accordance with 735 ILCS 5/2-701, there is an actual, justiciable controversy as to whether the moratorium was a valid exercise of the Board's power and whether Nevarez's permits should have been processed under the prior Zoning Ordinance, including, but not limited to, allowing him 6 shows instead of 4.

WHEREFORE, Plaintiff, Gustavo Nevarez, respectfully requests that this Court:

a) declare Resolution 22-29 of the County Board to be invalid under Illinois law and its own Zoning Ordinance;

b) declare that Nevarez was entitled to have 6 rather than only 4 animal shows in accordance with the prior Zoning Ordinance;

c) for damages, in an amount to be proved at trial; and

d) any further relief that this Court deems just.

## COUNT IV
**(Declaratory Judgment – Invalidity of Resolution 22-29 as Violative of Illinois Constitution- Procedural Due Process – Replead for Purposes of Appeal Only)**

110. Plaintiff realleges the allegations contained in paragraphs 1-67 as though fully contained in this paragraph.

111. Article I, § 2 of the Illinois Constitution provides that "[n]o person shall be deprived of life, liberty or property without due process of law nor be denied the equal protection of the laws."

112. On May 2, 2022, Nevarez applied for five temporary use permits for animal shows before the moratorium took effect, and two of the requested events were during the purported 60-day moratorium, which expired July 4, 2022. He requested permits for events on May 21, 2022 and June 18, 2022.

113. Resolution 22-29 was not lifted until June 14, 2022, too late for Nevarez to hold two of his events.

114. Resolution 22-29 violates Nevarez's procedural due process rights by taking away his right to have animal shows on this property in accordance with the provisions in the County's prior Zoning Ordinance without proper notice or a public hearing where Nevarez could present evidence and cross examine witnesses.

115.     In accordance with 735 ILCS 5/2-701, there is an actual, justiciable controversy as to whether the moratorium is unconstitutional and violative of Nevarez's rights to due process and equal protection of the laws and whether Nevarez's applications should have been processed under the prior Zoning Ordinance.

WHEREFORE, Plaintiff, Gustavo Nevarez, respectfully requests that this Court:

a) declare Resolution 22-29 unconstitutional as violative of Plaintiff's procedural due process rights;

b) declare that Nevarez's applications should have been processed under the prior Zoning Ordinance, which would have entitled him to have 6 rather than only 4 animal shows;

c) for damages, in an amount to be proven at trial; and

d) for any further relief that this Court deems just.

## COUNT V
### (Civil Rights Violation – 42 U.S.C. § 1983 (SUP))

116.     Plaintiff realleges the allegations contained in paragraphs 1-67 as though fully contained in this paragraph.

117.     42 U.S.C. § 1983  provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress…"

**The County's Denial of the SUP Application Violates Nevarez's Right to Equal Protection Under the U.S. Constitution**

118.    The Fourteenth Amendment to the U.S. Constitution provides that "no State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

119.    The U.S. Constitution requires government to govern impartially and to not draw distinctions between individuals solely on differences that are irrelevant to a legitimate governmental objective.

120.    Nevarez is in a protected class as a Hispanic individual of Mexican descent. Nevarez is similarly situated to the non-Hispanic, Caucasian applicants who applied for SUPs in 2019 for indoor/outdoor event spaces in the A-1 district in Boone County.  The County's application of its Zoning Ordinance to deny Nevarez's SUP application was predicated on Nevarez's protected class.  He is being treated differently than the way the non-Hispanic Caucasian applicants have been treated for the same use.

121.    The County is unequally applying its Zoning Ordinance based on its own prejudices and those of neighboring residents because Nevarez is Hispanic and of Mexican descent.

122.    The Board's actions have irreparably harmed Nevarez in that he is unable to use his Property in a way that is allowed by the County's Zoning Ordinance based on his ethnicity.

123.    The County's denial of the SUP was the result of an official custom of the County to treat County residents who are Hispanic and of Mexican descent in Boone County differently than the non-Hispanic, Caucasian County residents.

124.    This custom is illustrated by the actions of the County in denying Nevarez's SUP application and denying another Hispanic resident of Mexican descent, Jose Ojeda, an SUP for an event space in 2021 but approving the applications of two non-Hispanic Caucasian SUP

applications for event space; in treating charreadas differently than the "American" rodeos by singling them out for different treatment and requiring more stringent regulations on the charreadas; by temporarily banning animal shows, including charreadas, without providing proper notice or a public hearing and by not banning "American" rodeos and by the assistance of at least one Board member assisting the non-Hispanic community object to the Hispanic Rodeos.

125.    The County's denial of Nevarez's SUP application deprived Nevarez of his civil rights of equal protection afforded him under the Fourteenth Amendment of the U.S. Constitution.

126.    The County's actions have damaged Nevarez in an amount to be determined at trial.

WHEREFORE, Plaintiff, Gustavo Nevarez, respectfully requests that this Court:

a)  declare the decision of the County Board to deny his SUP application to be a violation of his civil rights under 42 U.S.C. § 1983;

b)  issue a permanent injunction enjoining the County from interfering with Plaintiff's proposed use of the Property as set forth in his SUP application;

c)  for compensatory damages to be determined at trial;

d)  for attorneys' fees; and

e)  for any further relief that this Court deems just.

DATED:  July 20, 2023

Respectfully submitted,

GUSTAVO NEVAREZ, JR.,
*Plaintiff*

By: /s/ Jamie A. Robinson
     One of His Attorneys

Jamie A. Robinson (ARDC No. 6270503)
(jr@brunolawus.com)
THE BRUNO FIRM, LLC
205 N. Michigan Ave., Ste. 810
Chicago, Illinois 60601

312-321-6481
Firm #60813

Richard Porter (ARDC No. 6209751)
(rporter@hinshawlaw.com)
Hinshaw & Culbertson LLP
100 Park Avenue
P.O. Box 1389
Rockford, Illinois 61105
815-490-4920
815-490-4901 (facsimile)

## **VERIFICATION**

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in the Third Amended Verified Complaint are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true.

_____
Gustavo Nevarez

# UNREPORTED
# CASE LAW

2021 WL 4459508
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.

Verzell JAMES, on behalf of himself
and all others similarly situated, Plaintiff,
v.
CITY OF EVANSTON, et al., Defendants.

No. 20-cv-00551
|
Signed 09/29/2021

## Attorneys and Law Firms

Cynthia H. Hyndman, Robert Lawrence Margolis, Robinson
Curley P.C., Chicago, IL, for Plaintiff.

Nicholas E. Cummings, Alexandra Brien MacKey Ruggie,
Kelley A. Gandurski, City of Evanston Department of Law,
Michelle Hemphill Ozuruigbo, City of Evanston, Evanston,
IL, for Defendant City of Evanston.

Benjamin Matthew Jacobi, Lawrence E. Neyland, O'Halloran
Kosoff Geitner & Cook, LLC, Northbrook, IL, for Defendant
Morton Grove Niles Water Commission.

## MEMORANDUM OPINION AND ORDER

Andrea R. Wood, United States District Judge

**\*1** Plaintiff Verzell James resides at a property he owns
in the City of Evanston, Illinois. In early 2018, Evanston
passed an ordinance that granted a zoning exemption to
the Morton Grove-Niles Water Commission ("Commission")
allowing it to construct a water pumping station at a property
neighboring James's home. James claims that Evanston and
the Commission (together, "Defendants") sought to avoid
public scrutiny of their plans to construct the water pumping
station and therefore declined to abide by proper zoning
procedures in obtaining approval of the project. Alleging
that Defendants pursued this course of action because the
affected community was predominantly African-American,
James filed the present putative class action. Defendants have
filed separate motions to dismiss (Dkt. Nos. 22, 23), along
with a joint motion to strike class allegations (Dkt. No. 20).
For the reasons that follow, Defendants' motions to dismiss
are granted and their motion to strike class allegations is
denied as moot.

## BACKGROUND

For the purposes of the motions to dismiss and the motion
to strike, the Court accepts all well-pleaded facts in the
complaint as true and views those facts in the light most
favorable to James as the non-moving party. *Killingsworth v.
HSBC Bank Nev., N.A.*, 507 F.3d 614, 618 (7th Cir. 2007);
*Tex. Hill Country Landscaping, Inc. v. Caterpillar, Inc.*,
No. 20-cv-0227, 2021 WL 780719, at *1 (N.D. Ill. Mar. 1,
2021). The complaint alleges as follows.

In February 2017, the Evanston City Council adopted an
ordinance approving a Water Supply Agreement under which
Evanston would supply water to the Villages of Morton Grove
and Niles ("Villages"). (Compl. ¶ 8, Dkt. No. 1.) To effectuate
the Water Supply Agreement, the Villages sought to construct
a Morton Grove-Niles Water System ("System"). (*Id.* ¶ 9.)
The Villages established the Commission in March 2017 to
design, construct, finance, and operate the System. (*Id.* ¶ 10.)

One key component of the System was to be an intermediate
water pumping station ("IPS") to aid in pumping water from
Lake Michigan to the Villages. (*Id.* ¶¶ 1, 12.) Originally,
the Commission selected a parcel of land in the Village
of Skokie owned by the Metropolitan Water Reclamation
District ("MWRD") as the site for the IPS. (*Id.* ¶ 12.)
According to the most recent U.S. Census Bureau Data, the
residents of the two census blocks closest to the proposed
Skokie site were between 66% and 76% white. (*Id.* ¶ 15.)
The Commission applied to the MWRD for an easement
for the construction of the IPS at the Skokie location in
December 2017. (*Id.* ¶ 12.) Around the same time, the
Commission applied to Skokie for a special use permit. (*Id.*
¶ 13.) Skokie's process for applying for a special use permit
required the Commission to provide at least 15-days' notice
to all individuals residing within 250 feet of the proposed
IPS site that the Commission would be appearing before the
Skokie Plan Commission to obtain a special use permit for
construction of the IPS. (*Id.* ¶ 14.) In compliance with this
requirement, the Commission notified about 45 residents who
lived within 250 feet of the proposed Skokie site of the public
hearing on the Commission's petition for a special use permit
scheduled for December 20, 2017, and published a public
notice of the hearing. (*Id.* ¶ 16.) At the December 20 public
hearing, Skokie removed the Commission's petition from
its Plan Commission's agenda after it became clear that the
MWRD would not grant the Commission the authorization

necessary for it to petition Skokie for zoning relief with respect to a property that the MWRD owned. (*Id.* ¶ 17.)

**\*2** After the proposed Skokie site fell through, the Commission began looking to construct the IPS in Evanston. (*Id.* ¶ 18.) It obtained a contract to construct the IPS at one location in Evanston but declined to move forward with construction there. (*Id.*) On January 8, 2018, the Evanston City Council passed an ordinance authorizing Evanston to lease from the MWRD the property located at 2525 Church Street "for recreational uses." (*Id.* ¶ 19.) Yet at the same time it passed the ordinance, Evanston was aware that the Commission sought to locate the IPS at 2525 Church Street. (*Id.* ¶ 20.) The 2525 Church Street property is located in Evanston's Fifth Ward and, according to the most recent U.S. Census Bureau data, residents in four of the five census blocks closest to the property are between 82% and 92% African-American. (*Id.* ¶ 21.) Residents in the remaining census block are 34.5% African-American, 44.8% Hispanic, and 20.7% white. (*Id.*) James is among the African-American residents of the Fifth Ward, and he resides at a property he owns located in the immediate area of the 2525 Church Street property. (*Id.* ¶¶ 5, 44, 48–49.)

On January 11, 2018, the Fifth Ward Alderman sent a newsletter that included an agenda for the Fifth Ward meeting scheduled for January 18, 2018. (*Id.* ¶ 22.) One of the items listed on the agenda was "Niles Morton Grove Water Pumping Station Proposals," although neither the newsletter nor the agenda included any further information about the IPS or proposed site locations. (*Id.*) Around this time, discussions were underway between the Commission and Evanston regarding the construction of the IPS. (*Id.* ¶ 23.) On January 30, 2018, Evanston's City Manager sent an MWRD representative a letter expressing support for the construction of the IPS at 2525 Church Street. (*Id.* ¶ 24.) Included with the letter was an attachment stating that a copy of the letter had been sent to 14 residents in the immediate area of the proposed site, including James. (*Id.*) But neither James nor any other resident named in the attachment received a copy of the City Manager's letter. (*Id.*)

As a property zoned as an "Open Space," there were very few permitted or special uses allowed at 2525 Church Street and a water pumping station was not among them. (*Id.* ¶ 25.) Under Evanston's Zoning Code of Ordinances ("Zoning Code"), however, a property owner, lessee, or other person with a legal or equitable interest in the property may obtain a "unique use" permit, granting them permission for a use not listed

as an authorized special or permitted use within a particular zoning district, so long as the use "would be of substantial ... economic benefit to the City." (*Id.* ¶ 26 (quoting Zoning Code § 6-3-7-1) [1] .) The unique use application process requires Evanston's Plan Commission to hold a public hearing on the application and to give public notice of the hearing. (*Id.* ¶ 27.) In addition, Evanston is required to mail notice of the public hearing to all property owners within 1000 feet of the property lines in each direction of the subject property and to post a sign with notice of the hearing on the subject property at least 10 business days prior to the hearing. (*Id.* ¶ 28.) Property owners within 1000 feet of the subject property also have the right to inspect all documents submitted as part of the unique use application and to present witnesses on their behalf. (*Id.* ¶ 29.)

Instead of seeking a unique use permit for the IPS, the Commission instead agreed with Evanston to obtain a municipal use exemption. (*Id.* ¶ 30.) Under the Zoning Code's municipal use exemption:

> Any governmental or proprietary function owned or operated by the City shall be a permitted use in any district. The City Council may approve buildings and structures owned and operated by the City that do not comply with all of the requirements of the underlying district, if they are necessary for the provision of desired City services and if the adverse impact on surrounding properties resulting from such noncompliance is minimized. Adverse impacts may be minimized by design, architectural treatment, screening, landscaping and/or placement on the lot. Such plan for reduction of adverse impact shall be subject to review by the Design and Project Review Committee.

**\*3** Zoning Code § 6-7-4. The process for obtaining a municipal use exemption did not require specific notice to property owners and did not allow property owners to raise objections to the use. (Compl. ¶ 30.)

On February 12, 2018, Evanston's Administration and Public Works Committee and Planning and Development Committee each held separate meetings to consider the Commission's plan to construct the IPS at 2525 Church Street. (*Id.* ¶¶ 34–35.) Both committees unanimously adopted resolutions authorizing the construction of the IPS. (*Id.*) The same day, following the conclusion of each committee's meeting, the Evanston City Council met and approved resolutions authorizing the Commission to construct and operate the IPS at 2525 Church Street and granting it a municipal use exemption for that purpose. (*Id.* ¶¶ 36–37.) The City Council heard no public comment regarding those resolutions. (*Id.* ¶ 36.)

One day later, the Fifth Ward Alderman and a Commission representative attended a meeting of an informal organization of residents living in the vicinity of 2525 Church Street, where they informed attendees of the plans for construction of the IPS. (*Id.* ¶ 40.) For James and most of the attendees of the meeting, this was the first time they were made aware of the plan to construct the IPS at 2525 Church Street. (*Id.*) Yet they were told that it was too late to take any action to halt its construction in light of the Evanston City Council's vote the previous night. (*Id.*) Nonetheless, James filed an appeal with Evanston's Zoning Board of Appeals on March 8, 2018, challenging the municipal use exemption. (*Id.* ¶ 43.) Subsequently, James was advised by Evanston's Law Department that he did not have a means to appeal the City Council's authorization of the municipal use exemption. (*Id.*) Despite James and other residents' concerns about the impact of the noise and vibrations from the IPS station on their health, they were left without recourse to challenge the construction of the IPS. (*Id.* ¶ 44.) Thus, construction moved forward on the project. (*Id.* ¶ 45.)

According to James, IPS construction activities caused damage such as cracks in the ceiling and walls to his home and to the homes of other residents in the immediate vicinity of 2525 Church Street. (*Id.*) James also contends that the value of properties neighboring the IPS has been harmed due to the loss of open and green space that previously existed at 2525 Church Street and for which the property was zoned. (*Id.* ¶ 47.)

Based on the circumstances leading up to the construction of the IPS, James has brought the present class action against the Commission and Evanston. He claims that Defendants conspired to construct the IPS in the predominantly African-American neighborhood surrounding 2525 Church Street

while avoiding as much public scrutiny as possible. (*Id.* ¶ 1.) To achieve this end, Defendants worked together to allow the Commission to obtain a municipal use exemption for the IPS and avoid the process for acquiring a unique use permit and its attendant public notice and hearing procedures. (*Id.*) James contends that Defendants' conduct deprived him and similarly situated residents of the opportunity to challenge the construction of the IPS in their neighborhood. (*Id.*)

**\*4** James's complaint contains five counts asserting claims on behalf of himself and either a proposed class of all residents living within 1000 feet of the 2525 Church Street property or a proposed subclass of all African-American residents living within 1000 feet of that property. In Count I, James asserts a claim under 42 U.S.C. § 1985(3), alleging that Defendants conspired to deprive him and the proposed class of their rights to equal protection of the law by working together to wrongfully obtain a municipal use exemption for the IPS because the affected residents were African-American or lived in close proximity and associated with African Americans. Count II asserts claims against each Defendant under 42 U.S.C. § 1982 for violating James's and the proposed subclass members' rights to hold property on an equal basis with white persons. Counts III and IV assert claims against Evanston under 42 U.S.C. § 1983 for depriving James and the proposed class members of their procedural and substantive due process rights. Finally, Count V sets forth a claim against Defendants for discriminating against James and the proposed subclass in violation of the Illinois Civil Rights Act, 740 ILCS 23/5.

## DISCUSSION

Each Defendant has separately moved to dismiss James's complaint and jointly moved to strike his class allegations. Both Defendants move to dismiss under Federal Rule of Civil Procedure 12(b)(6) and Evanston also seeks dismissal under Rule 12(b)(1). Because Defendants' motions to dismiss, taken together, challenge all claims set forth in James's complaint, if they are granted in their entireties, the motion to strike class allegations will be moot. Thus, the Court begins by addressing the motions to dismiss.

### I. Ripeness

Evanston has moved under Rule 12(b)(1) to dismiss James's entire complaint, arguing that this Court lacks jurisdiction due

to James's failure to exhaust the state-law remedies available to address his alleged constitutional deprivations. Defendants base this supposed exhaustion requirement on the Supreme Court's decision in 🏴 *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172, 195 (1985), which held that a claim under the Fifth Amendment's Takings Clause generally is not ripe until the property owner has exhausted all available state-law remedies for compensation. The Seventh Circuit subsequently found that a property owner could not avoid *Williamson County*'s ripeness requirement "by applying the label 'substantive due process' to the claim. So too with the label 'procedural due process.' Labels do not matter. A person contending that state or local regulation of the use of land has gone overboard must repair to state court." 🏴 *River Park, Inc. v. City of Highland Park*, 23 F.3d 164, 167 (7th Cir. 1994). Of course, *Williamson County* was overruled by 🏴 *Knick v. Township of Scott*, 139 S. Ct. 2162 (2019). However, Evanston insists that *Knick* overruled *Williamson County* only with respect to Fifth Amendment takings claims and did nothing to disturb the Seventh Circuit's extension of the ripeness requirement to Fourteenth Amendment due process claims. [2]

**\*5** Before *Williamson County* was overruled, the Seventh Circuit described it as creating "a takings-claim exception to [the] general requirement that exhaustion is not required in 🏴 § 1983 suits." 🏴 ⚠ *Daniels v. Area Plan Comm'n*, 306 F.3d 445, 453 (7th Cir. 2002). Indeed, just a few years before its *Williamson County* decision, the Supreme Court held that "exhaustion of state administrative remedies should not be required as a prerequisite to bringing an action pursuant to 🏴 § 1983." 🏴 *Patsy v. Bd. of Regents*, 457 U.S. 496, 516 (1982). Despite this seemingly categorical rule, the Supreme Court found in *Williamson County* that *Patsy* did not preclude requiring administrative exhaustion for takings claims because "no constitutional violation occurs until just compensation has been denied." 🏴 *Williamson Cnty.*, 473 U.S. at 194 n.13. In *Knick*, however, the Supreme Court repudiated *Williamson County*'s understanding of the Takings Clause, holding that a property owner has a takings claim "as soon as a government takes his property for public use without paying for it .... regardless of post-taking remedies that may be available." 🏴 *Knick*, 139 S. Ct. at 2170.

In *Knick*, the Supreme Court expressed the view that *Williamson County*'s ripeness requirement "relegates the

Takings Clause to the status of a poor relation among the provisions of the Bill of Rights," as "[p]laintiffs asserting any other constitutional claim are guaranteed a federal forum under 🏴 § 1983" whereas authority over takings claims was handed to state courts. 🏴 *Knick*, 139 S. Ct. at 2169–70. By overturning *Williamson County*, the Supreme Court in *Knick* meant to ensure that "[t]akings claims against local governments [are] handled the same as other claims under the Bill of Rights." 🏴 *Id.* at 2177. The import of *Knick* is clear—failure to exhaust state remedies does not preclude a plaintiff from bringing a 🏴 § 1983 claim, regardless of the constitutional violation alleged; *Williamson County*'s ripeness requirement for takings claims was an aberration that *Knick* found necessary to eliminate. Any extension of that aberration to non-takings claims necessarily fails.

When the Seventh Circuit applied the ripeness requirement to procedural and substantive due process claims, it did so to prevent plaintiffs with takings claims from avoiding the exhaustion requirement. Thus, where the challenged government action gave rise to a takings claim subject to exhaustion in state court, the Seventh Circuit required that any other constitutional claims arising from that action be exhausted in state court as well. *See* 🏴 *Gamble v. Eau Claire County*, 5 F.3d 285, 287 (7th Cir. 1993) ("*Williamson* holds that even if a taking can be challenged as a denial of substantive due process, a suit based on this theory is premature if the plaintiff has possible state remedies against the zoning regulation or other state action that he wants to attack."). With takings claims now no longer subject to the exhaustion requirement, the Seventh Circuit's rationale for requiring exhaustion for procedural and substantive due process claims challenging state or local land use regulations has evaporated. Moreover, maintaining the administrative exhaustion requirement would be directly contrary to the Supreme Court's stated purpose in *Knick* of ensuring that all constitutional claims brought under 🏴 § 1983 be treated the same.

Finally, Evanston argues that *Knick* specifically distinguished takings claims from due process claims. It points to a portion of the *Knick* opinion criticizing *Williamson County*'s reliance on 🏴 *Parratt v. Taylor*, 451 U.S. 527 (1981). *See* 🏴 *Knick*, 139 S. Ct. at 2174. But *Parratt* is understood to stand for the proposition that "a claim under 🏴 § 1983 for deprivation of property without prior notice and an opportunity for

hearing fails where the property deprivation is the result of random and unauthorized acts by state officials and where a meaningful post-deprivation remedy is available."

*Brunson v. Murray*, 843 F.3d 698, 715 (7th Cir. 2016). For present purposes, it suffices to say that *Parratt* concerns the viability of a due process claim and has nothing to do with ripeness for determination. *See Veterans Legal Def. Fund v. Schwartz*, 330 F.3d 937, 941 (7th Cir. 2003) ("The whole idea of a procedural due process claim is that the plaintiff is suing because the state failed to provide adequate remedies. We do not require a plaintiff to pursue [state] remedies in order to challenge their adequacy, but likewise we do not allow a plaintiff to claim that she was denied due process just because she chose not to pursue remedies that were adequate."). Thus, James's failure to exhaust state remedies goes to the merits of his procedural due process claim and does not furnish a basis for dismissal on ripeness grounds. Evanston's Rule 12(b)(1) motion is therefore denied.

## II. Federal Claims

**\*6** Together, Defendants' Rule 12(b)(6) motions seek dismissal of all claims brought against them under 42 U.S.C. §§ 1982, 1983, and 1985(3). To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This pleading standard does not necessarily require a complaint to contain detailed factual allegations. *Twombly*, 550 U.S. at 555. Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014) (quoting *Iqbal*, 556 U.S. at 678).

### A. Applicability of Municipal Use Exemption

Each of James's federal claims is predicated on Defendants' decision wrongfully to obtain a municipal use exemption for the IPS rather than properly applying for a unique use permit, which would have entailed holding a public hearing on the application and providing the public sufficient notice of that hearing. The gist of each claim is that Defendants used an inapplicable provision of the Zoning Code to deprive the public of the opportunity to challenge the construction of the IPS at 2525 Church Street and did so because the affected community was predominantly African-American. By contrast, when the Commission tried to construct the IPS in a predominantly white community in Skokie, it sought a special use permit and provided the public with all notice that was due. Defendants, on the other hand, contend that their decision to obtain a municipal use exemption was permissible under the Zoning Code.

James's complaint alleges that a municipal exemption may be granted for " 'buildings and structures owned and operated by the City' as long as the buildings or structures granted the exemption are 'necessary for the provision of desired City services.' " (Compl. ¶ 31 (quoting Zoning Code § 6-7-4).) He claims that because the IPS was not owned or operated by Evanston and was not necessary for the provision of any City service, it did not qualify for a municipal use exemption. But as Defendants point out, James's complaint selectively quotes from the applicable provision of the Zoning Code. The entire provision is set out in a single paragraph consisting of four sentences. James quotes from the second sentence, which Defendants contend applies to buildings and structures. Defendants argue that the applicable portion of the municipal use exemption actually appears in the first sentence, which provides that "[a]ny governmental or proprietary function owned or operated by the City shall be a permitted use in any district." (*Id.*) That sentence governs uses. According to Defendants, because providing and pumping water to the Villages is a proprietary function operated by Evanston, the municipal use exemption applies on its face.

While James disagrees that Defendants need only show that the IPS was a proprietary function operated by Evanston to qualify for a municipal use exemption, he insists that the Court need not reach that issue. First, he claims that Evanston's sale of water to the Villages is not a proprietary function. However, the Illinois Supreme Court has long recognized that a "municipal corporation selling ... water ... for private consumption does so in its proprietary rather than governmental capacity." *City of Chicago v. Ames*, 7 N.E.2d 294, 296 (Ill. 1937); *see also Baltis v. Village of Westchester*, 121 N.E.2d 495, 500 (Ill. 1954) ("[A] municipal corporation owning and operating a water system and selling water to individuals, although engaged in a public service, does so in its business or proprietary capacity...."). According to James, those cases are distinguishable because they involved a municipality selling water to its own residents,

whereas here, Evanston is making sales exclusively to residents of the Villages. But there is no basis to treat sales to residents differently from sales to non-residents. Indeed, such an understanding is not supported by the common understanding of the meaning of "proprietary function." For example, Black's Law Dictionary defines the phrase to mean: "A municipality's conduct that is performed for the profit or benefit of the municipality, rather than for the benefit of the general public." Black's Law Dictionary (11th ed. 2019). Certainly, a municipality earns a profit or benefit from selling water to non-residents just as it does from sales to residents. Moreover, the Illinois Supreme Court has held that "[n]o distinction is to be drawn between" the business of water sales "when indulged by a municipality and when engaged in by a private corporation." *Ames*, 7 N.E.2d at 296. A business, of course, has no residents—its sales are sales. The same must be true of a municipality in the business of selling water; the character of its sales cannot be dependent on the residency of its customers. For that reason, the Court finds that the operation of the IPS is a proprietary function.

**\*7** James, however, claims that for the municipal use exemption to apply, the proprietary function must be either owned or operated by Evanston. While Evanston claims that it operates the IPS, James emphasizes that he has alleged that "Evanston would not own or operate" the IPS. (Compl. ¶ 31.) He also notes that the Commission represented in its easement agreement with the MWRD that it would use the 2525 Church Street property to "construct, install, operate, maintain, repair, and remove a pump station." (*Id.* ¶ 41.) Thus, James asserts that the easement agreement establishes that it would be the Commission (not Evanston) that operates the IPS. Defendants respond by noting that James's complaint includes a contradictory allegation that "Evanston represented to residents and others on its web page that Evanston would operate the [IPS]." (*Id.* ¶ 42.) There are also facts from outside the complaint as to Evanston's operation of the IPS that Defendants ask the Court to consider in connection with the motions to dismiss. Specifically, Defendants direct the Court to the website referenced in the allegation, where Evanston provides a detailed overview of the IPS. Among other things, Evanston explains that the Commission "will handle construction and maintenance of the [IPS], but it will be operated by the City." *Water Pump Station Frequently Asked Questions*, City of Evanston, https://www.cityofevanston.org/government/ departments/public-works/public-outreach/pump-station (last visited Mar. 22, 2021). Specifically, "[t]he pumps in the

[IPS] will be remotely operated by the water plant operators at the Evanston Water Plant." *Id.*

The Court cannot reject at the pleading stage James's claim that Evanston does not operate the IPS. To the extent the Court can treat Evanston's website as either incorporated by reference into the complaint or subject to judicial notice,[3] the website shows, at most, that Evanston represented to the public that it would operate the IPS. But for the Court to accept that representation as true (and further as contradicting the complaint's allegation that Evanston did not operate the IPS), it would have to view the facts in the light most favorable to Defendants, which it cannot do in connection with a motion to dismiss. Instead, when viewing the allegations concerning Evanston's website in the light most favorable to James, they are consistent with his contention that Evanston made a false representation to the public. Whether Evanston's representation was, in fact, false is a question of fact to be decided later.

Nonetheless, even accepting as true James's allegation that Evanston does not operate the IPS, it is not entirely clear that the municipal exemption is inapplicable. Rather, it may be the case that treating the IPS itself as the proprietary function is viewing the term "proprietary function" too narrowly. Indeed, viewing the proprietary function at 2525 Church Street as simply pumping water overlooks that it is simply one of several components of the System, each of which serve the same, single purpose for which the System was constructed—to supply water to the Villages. (Compl. ¶¶ 8–9.) If the proprietary function is viewed broadly as the supplying of water to the Villages (*i.e.*, the System), it is apparent from the complaint that Evanston may have at least some operational role because Evanston supplies the water. (*See id.* ¶¶ 8, 41.) Yet James contends that even if Evanston operates a proprietary function—*i.e.*, fulfills the criteria in the first sentence of the exemption—that is not enough for the IPS to qualify for the exemption. Rather, the IPS must also meet the criteria set out in the ordinance's second sentence—it must also be housed in a building owned and operated by Evanston, be necessary for the provision of desired city services, and the adverse impact from noncompliance must be minimized.[4] In response, Defendants contend that the criteria found in the second sentence only regulate the building or structure, and here, James has failed to establish that the structure in which the IPS is housed is nonconforming.

**\*8** Determining whether the IPS satisfied all applicable criteria for a municipal use exemption is a matter of statutory

interpretation. "Under Illinois law, municipal ordinances are interpreted according to the traditional rules of statutory construction." 🔲*Pro's Sports Bar & Grill, Inc. v. City of Country Club Hills*, 589 F.3d 865, 871 (7th Cir. 2009). "Illinois directs courts to ascertain and give effect to the intent of the enacting body, the clearest indicator of which is the language of the ordinance itself." *Id.* "Where the language of a statute is clear, the Court will not read into it exceptions that the legislature did not express, and the Court will give the statute its effect as written." *Bethlehem Enters., Inc. v. City of Oak Forest*, No. 06 C 1772, 2007 WL 9706479, at *4 (N.D. Ill. July 20, 2007).

To begin, the Court finds that the alleged noncompliance at issue in James's complaint is the use of the 2525 Church Street property for water pumping. (*See, e.g.*, Compl. ¶ 25 ("The [IPS] would not qualify as either a permitted or special use in an Open Space district.").) The Zoning Code defines "use" to mean "[t]he purpose or activity for which the land, building or structure is designed, arranged, or intended, or for which it is occupied or maintained." Zoning Code § 6-18-3. Thus, the use concerns the activities occurring on the property. For example, in an Open Space district like 2525 Church Street, permitted uses include golf courses, parks, and playgrounds. *Id.* § 6-15-9-2.

The allowable uses for a zoning district are distinct from the regulations addressing the building and structures erected in the zoning district. In the Zoning Code's chapter addressing Open Space districts, there are two subsections concerning permitted and special uses and four subsections governing the buildings and structures' size, width, floor-area ratio, and height. *Compare id.* § 6-15-9-2–3, *with id.* § 6-15-9-4–7. Accordingly, the Zoning Code sets out separate processes for applying for a nonconforming use and for obtaining permission for a nonconforming building or structure. Thus, the unique use permit that James asserts Defendants should have obtained is meant to "allow a use which is determined by the City Council[ ] to be an unusual one-of-a-kind use that is not listed as an authorized special or permitted use within a particular zoning district." *Id.* § 6-3-7-1. By contrast, the variation process governs exemptions where the physical characteristics of the property deviate from the Zoning Code. *Id.* § 6-3-8-1, 3.

Recognizing the ways that the Zoning Code distinguishes between nonconforming uses and nonconforming buildings and structures bears on the proper understanding of the municipal use exemption. When considering the full context of the Zoning Code, there are two distinct regulations contained within the provision—one for uses and one for buildings and structures. While some uses may implicate both regulations, that will not always be the case. If a governmental or proprietary function is owned or operated by Evanston, it is a permitted use in any zoning district. Where that function does not require a building or structure or can be housed in a building or structure that complies with the requirements of the relevant zoning district, the use qualifies for the exemption and the inquiry is over. But if the function requires the construction of a building or structure that does not comply with the requirements of the zoning district, the City Council may only grant a municipal use exemption where the building or structure is owned and operated by Evanston, is necessary for the provision of City services, and the adverse impact on neighboring properties resulting from noncompliance is minimized. In short, the second sentence is only triggered where the use would be housed in a nonconforming building or structure.[5] That is the only reasonable interpretation of the ordinance.

**\*9** By contrast, James's proposed interpretation is inconsistent with the Zoning Code's separate treatment of the uses of property and the physical characteristics of the buildings and structures erected on property. Moreover, under his interpretation, at least some portion of the first or second sentence would necessarily be rendered meaningless surplusage. *See* 🔲*Nielson v. Preap*, 139 S. Ct. 954, 969 (2019) ("[T]he interpretive canon against surplusage [expresses] the idea that every word and every provision is to be given effect and that none should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence." (internal quotation marks omitted)).

Nowhere in James's complaint does he take issue with the building or structure in which the IPS is housed or otherwise make any allegations suggesting that it is noncompliant with the requirements of an Open Space district. Without any facts demonstrating that the structure housing the IPS is nonconforming, James cannot plead the inapplicability of the municipal use exemption by relying on the second sentence of the ordinance. Instead, under the unambiguous meaning of the municipal use exemption, the Court finds that the IPS would be a permitted use at 2525 Church Street so long as it is found to be a proprietary function operated by Evanston. However, the Court cannot definitively decide the issue at this stage because there remain too many factual issues concerning whether Evanston is, in fact, operating a proprietary function at 2525 Church Street. As discussed above, it is not clear

whether the IPS or the System should be deemed to be the relevant proprietary function. If the former, then James's allegation that Evanston did not operate the IPS defeats any argument that Defendants have about the applicability of the municipal use exemption. If the latter, there remain issues of fact concerning Evanston's role in operating the IPS. For now, it suffices to say that the applicability of the municipal use exemption is at least debatable. Thus, Defendants cannot obtain dismissal of all the federal claims by arguing that the municipal use exemption plainly applies to the IPS. The Court therefore proceeds to address each of James's federal claims in turn.

## B. Section 1982

James contends that Defendants violated 42 U.S.C. § 1982 by improperly using the municipal use exemption to obtain approval for the construction of the IPS at 2525 Church Street. Specifically, he claims that Defendants impaired his and the subclass members' property rights by bypassing proper zoning procedures to avoid giving adequate notice of the construction of the IPS to the predominantly African-American residents in the vicinity of 2525 Church Street when they would have been more transparent about their plan if the affected residents were white.

Section 1982 provides that "[a]ll citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." 42 U.S.C. § 1982. The Supreme Court has construed the statute broadly and found that it protects "the right of black persons to hold and acquire property on an equal basis with white persons and the right of blacks not to have property interests impaired because of their race." City of Memphis v. Greene, 451 U.S. 100, 120 (1981). Thus, the Supreme Court has suggested that § 1982 "might be violated by official action that depreciated the value of property owned by black citizens." Id. at 123.

To state a § 1982 claim, a plaintiff must allege that "the defendant had a racial animus, intended to discriminate against the plaintiff, and deprived the plaintiff of protected rights because of the plaintiff's race." Whisby-Myers v.

Kiekenapp, 293 F. Supp. 2d 845, 850 (N.D. Ill. 2003). Here, Defendants argue that James has not adequately alleged that Defendants deprived him and the members of the subclass of their protected property rights because of their race. In interpreting 42 U.S.C. § 1981—a provision "using nearly identical language" as § 1982—the Supreme Court has held that a plaintiff must "initially plead and ultimately prove that, but for race, it would not have suffered the loss of a legally protected right." Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media, 140 S. Ct. 1009, 1016, 1019 (2020). It noted that its prior treatment of § 1982 supported its conclusion. Id. at 1016. Specifically, the Supreme Court stated that it had "repeatedly held that a claim arises under § 1982 when a citizen is not allowed to acquire property *because of* color," and there was no reason to "demand less from a § 1981 plaintiff." Id. at 1016–17 (internal quotation marks and alteration omitted). And it further noted that the requirement that a plaintiff prove that the defendant's conduct was "because of" race was "often associated with but-for causation." Id. at 1016. Thus, because Comcast imposed a but-for causation requirement for § 1981 claims, it follows that a § 1982 plaintiff must also plead that his race was the but-for cause of the defendant's conduct. See id. at 1016–17.[6]

*10 Under Comcast, the relevant question before the Court is whether James adequately alleges that but for his and the subclass members' race, Defendants would not have decided to pursue a municipal use exemption to locate the IPS at 2525 Church Street. The "but-for" causation standard is narrower than the "motivating factor" causation standard applicable to claims brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, which requires a plaintiff to show only that discrimination was a motivating factor in a defendant's challenged employment decision. Comcast, 140 S. Ct. at 1017; *see also* Hasan v. U.S. Dep't of Labor, 400 F.3d 1001, 1006 (7th Cir. 2005) ("A motivating factor is a factor that weighs in the defendant's decision to take the action complained of.... It is a, not necessarily the, reason he takes the action."). Under the but-for causation standard, it is not enough for a plaintiff to allege "that racial discrimination was one factor among many in a defendant's decision. Racial discrimination must be the determining factor." Piccioli v. Plumbers Welfare Fund Loc. 130, U.A.,

No. 19-cv-00586, 2020 WL 6063065, at *6 (N.D. Ill. Oct. 14, 2020) (addressing § 1981 claim). That means James's allegations must allow the Court reasonably to infer that Defendants would have obtained a unique use permit for the IPS rather than a municipal use exemption had the affected residents been predominantly white. *See Bachman v. St. Monica's Congregation*, 902 F.2d 1259, 1262–63 (7th Cir. 1990) ("To be actionable, racial prejudice must be a but-for cause, or in other words a necessary condition of the refusal to transact. Otherwise there is no harm from the prejudice—the harm would have occurred anyway...." (citations omitted)).

While James contends that his and the subclass members' race was the reason that Defendants sought a municipal use exemption, his allegations point to the but-for cause of Defendants' conduct being a desire to avoid public scrutiny. Indeed, James expressly alleges that Defendants bypassed zoning procedures, in part, "to avoid public scrutiny." (Compl. ¶ 1.) Further, he repeatedly claims or implies that the primary aim of Defendants' conduct was to deprive the affected residents of notice and an opportunity to object to the construction of the IPS at 2525 Church Street. (*Id.* ¶¶ 22, 30, 44, 46, 60, 72.) Defendants' alleged motivation of securing approval for the project with limited public scrutiny is an independent motivation capable of standing apart from racially discriminatory animus. Of course, "[o]ften, events have multiple but-for causes" and a defendant "cannot avoid liability just by citing some *other* factor" that played a role in its conduct. *Bostock v. Clayton County*, 140 S. Ct. 1731, 1739 (2020). And it certainly would be possible to allege that Defendants sought to evade public scrutiny *because* of racially discriminatory animus. But the allegations must support the connection—discriminatory animus cannot be bootstrapped to another independent motivation.

There are two main allegations that James contends supports a plausible inference that Defendants sought to deprive him and the subclass of the opportunity to scrutinize the IPS project because of their race. First, there is the fact that the residents residing closest to 2525 Church Street were predominantly African-American. However, "disparate impact alone is almost always insufficient to prove discriminatory purpose." *Alston v. City of Madison*, 853 F.3d 901, 907 (7th Cir. 2017). Thus, James points to his allegations concerning how the Commission applied for a special use permit and adhered to all the associated notice procedures when it sought to locate the IPS in a predominantly white neighborhood in

Skokie. But the Commission's conduct with respect to the abandoned Skokie plans did not involve Evanston and says nothing of Evanston's intent. Moreover, that the Commission initially sought to locate the IPS in a predominantly white neighborhood suggests that the Commission was not targeting only African-American neighborhoods as potential sites. [7] Notably, James does not allege that the Commission knew or should have known the demographic composition of the residents living near either the proposed Skokie site or 2525 Church Street.

**\*11** In any case, as pleaded, the different approach the Commission took in Skokie reveals little with respect to the approach it ultimately took in Evanston because the white residents in Skokie were not similarly situated to James and the subclass members. "A person is similarly situated to the plaintiff if the person is 'comparable to the plaintiff in all material respects.' " *Webb v. Budz*, 480 F. Supp. 2d 1050, 1057 (N.D. Ill. 2007) (quoting *Crawford v. Ind. Harbor Belt R.R. Co.*, 461 F.3d 844, 846 (7th Cir. 2006)). The analysis requires a court to determine whether there are "enough common features between the individuals to allow a meaningful comparison." *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007), *aff'd*, 553 U.S. 442 (2008). Here, the obvious difference between the white Skokie residents, on the one hand, and James and the subclass members, on the other hand, is that they reside in different municipalities with each municipality subject to its own zoning code. Indeed, the complaint makes clear that there are differences between the zoning codes, as James alleges that the IPS would require a special use permit if built in Skokie whereas he claims that it would require a unique use permit in Evanston. (Compl. ¶¶ 13, 26.) Further, it is evident that the notice procedures associated with applying for the relevant use in each municipality vary. (*Id.* ¶¶ 14, 26–29.) Finally, James does not allege that Skokie has a municipal use exemption or some comparable exemption.

Even if Skokie had a municipal use exemption available to the Commission on terms comparable to the one in Evanston, the two municipalities were also differently situated with respect to the IPS. Although the Court accepts as true at this stage that Evanston did not operate the IPS, Evanston was not entirely a stranger to the project because it was the supplier of the water that the IPS was constructed to pump. As discussed above, Evanston's relationship to the System at least gave it a colorable argument that the IPS was a proprietary function under the municipal use exemption. On

the other hand, James's complaint reveals no role for Skokie in the System. Consequently, Skokie would not have the same argument as Evanston—if any—for the applicability of the municipal use exemption. Given these material differences between Skokie and Evanston, the Court cannot reasonably infer from the allegations that race was the key factor underlying the Commission's contrasting procedural choices.

*See* Coleman v. Donahue, 667 F.3d 835, 846 (7th Cir. 2012) ("[The similarly situated requirement's] purpose is to eliminate other possible explanatory variables ... which helps isolate the critical independent variable—discriminatory animus." (internal quotation marks omitted)).

As for Evanston, James claims that procedural irregularities leading to the approval of the IPS at 2525 Church Street support a reasonable inference that race was the reason why Evanston acted as it did. The Supreme Court has identified "[d]epartures from the normal procedural sequence" as one type of evidence that could show that an improper discriminatory purpose played a role in official action. *See* Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 266 (1977). The primary allegation supporting the existence of a departure from the normal procedural sequence is that Evanston recommended that the Commission seek a municipal exemption and ultimately approved it. James claims that using this exemption was a departure from the normal procedural sequence, but he fails to allege how Evanston previously proceeded differently in comparable circumstances. James also cites misrepresentations Evanston allegedly made in connection with the process for seeking approval of the project. Of those alleged misrepresentations, only one was actually made to the general public and that misrepresentation came after the Evanston City Council approved construction of the IPS at 2525 Church Street. (Compl. ¶¶ 24, 33, 41–42.) At bottom, the allegations that supposedly reveal Evanston's racially discriminatory purpose only would show that Evanston sought to fast-track the approval process for the IPS with minimal public scrutiny. Again, such allegations do not suffice to connect Evanston's lack of transparency to the affected residents' race.

**\*12** In sum, James has failed to allege adequately that his and the subclass members' race was the but-for cause of Defendants' decision to seek a municipal use exemption to construct the IPS at 2525 Church Street. For that reason, his § 1982 claim is dismissed.

## C. Conspiracy to Deny Equal Protection Rights

James asserts that, by agreeing to pursue a municipal use exemption for the IPS, Defendants entered into a conspiracy to deprive him and the class members of the equal protection of the laws in violation of 42 U.S.C. § 1985(3). To state a civil conspiracy claim under § 1985(3), a plaintiff must allege "(1) the existence of a conspiracy, (2) a purpose of depriving a person or class of persons of equal protection of the laws, (3) an act in furtherance of a conspiracy, and (4) an injury to person or property or a deprivation of a right or privilege granted to U.S. citizens." Hernandez v. Joliet Police Dep't, 197 F.3d 256, 263 (7th Cir. 1999).

A viable § 1985(3) claim requires a plaintiff to "plead specific material facts that show the existence of the agreement" and "that, in entering the agreement, Defendants intended to discriminate against Plaintiffs and deprive them of their constitutional rights *because of* Plaintiffs' race." Linda Constr. Inc. v. City of Chicago, No. 15 C 8714, 2016 WL 4429893, at *3 (N.D. Ill. Aug. 22, 2016) (citing Winterland Concessions Co. v. Trela, 735 F.2d 257, 262 (7th Cir. 1984) and Griffin v. Breckenridge, 403 U.S. 88, 102–03 (1983)). Thus, the Court's conclusion above that James has not adequately pleaded that race was a determinative reason for Defendants' conduct applies equally here. *See* Bray v. Alexandria Women's Health Clinic, 506 U.S. 263, 275–76 (1993) ("[T]he 'intent to deprive of a right' requirement demands that the defendant do more than merely be aware of a deprivation of right that he causes, and more than merely accept it; he must act at least in part for the very purpose of producing it.").

Furthermore, James has not sufficiently pleaded the existence of a conspiracy. "In order to establish the existence of a conspiracy, ... a plaintiff must demonstrate that the conspirators have an agreement to inflict injury or harm upon him." Hernandez, 197 F.3d at 263. The allegations must demonstrate that the conspirators acted "with a single plan, the general nature and scope of which is known to each would-be conspirator." Id. James's complaint contains only limited allegations concerning any direct communications between the Commission and Evanston. Specifically, he alleges that the two had discussions regarding the construction of the IPS in late January 2018 that led to an

agreement that the Commission would apply for a municipal use exemption. (Compl. ¶¶ 23, 30.) At most, if proved, these allegations would show that there was an agreement between the Commission and Evanston to obtain approval for the project by way of the municipal use exemption. But it would not support a finding that the two chose that route based on a shared common objective of depriving James and the class of their right to equal protection of the laws.

Thus, James's civil conspiracy claim fails for two reasons: first, he fails to allege adequately that Defendants acted with a single plan known to both Evanston and the Commission; and second, he has not pleaded adequately that Defendants sought to deprive him and members of the class of their equal protection rights because of their race. Therefore, James's § 1985(3) claim is dismissed.

### D. Procedural Due Process

**\*13** Even setting aside the race of the residents affected, James claims that Evanston still violated his and the class members' rights to procedural due process under the Fourteenth Amendment to the Constitution. To find a valid procedural due process claim, a court must first "determine whether the plaintiff was deprived of a protected interest" and, if so, it then "must determine what process is due." *Pugel v. Bd. of Trs. of Univ. of Ill.*, 378 F.3d 659, 662 (7th Cir. 2004). James's claim centers on Evanston's alleged failure to give the residents living near 2525 Church Street sufficient notice and an opportunity to challenge the construction of the IPS at 2525 Church Street. As a result of the construction of the IPS, James claims that he and the members of the proposed class were deprived of their interest in the value of their properties.

Seeking dismissal, Evanston first contends that James does not have a protected property interest in the value of his property. Property interests are not created by the Constitution but instead "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). Neither Evanston nor James points to any controlling authority addressing whether property value is among the interests protected by procedural due process. Undoubtedly, an owner of real property has a protected interest in that property. What is less clear is whether a property owner has a protected

property interest in the intangible economic value of his property.

At least one Illinois court has found that a property's value is not itself a protected property interest. *Groenings v. City of St. Charles*, 574 N.E.2d 1316, 1324 (Ill. App. Ct. 1991) (characterizing property owners' interest in increasing the value of their land "as an entitlement rather than an expectancy"); *see also Residences at Riverbend Condo. Ass'n v. City of Chicago*, 5 F. Supp. 3d 982, 988 (N.D. Ill. 2013) ("Illinois courts do not recognize property values ... as constitutionally protected property interests." (citing *Groenings*, 574 N.E.2d at 1324)). Many other courts have found that procedural due process does not protect against official action that causes a reduction in value to property, absent a taking or near total loss of value. *E.g.*, *BAM Historic Dist. Ass'n v. Koch*, 723 F.2d 233, 237 (2d Cir. 1983); *Trotta v. Borough of Bogota*, No. 12-cv-2654 (KM)(MAH), 2016 WL 3265689, at \*8 (D.N.J. June 6, 2016). Furthermore, the Seventh Circuit has strongly suggested that a property owner is not entitled to due process with respect to action not directed at his property. *See Muscarello v. Ogle Cnty. Bd. of Comm'rs*, 610 F.3d 416, 423 (7th Cir. 2010) (holding that a property owner "does not have a property interest in the lifting of zoning restrictions on another's property"); *see also Tri-State Disposal, Inc. v. Village of Riverdale*, 369 F. Supp. 3d 866, 876 (N.D. Ill. 2019) ("[The plaintiff] fails to plead how its ownership of property entitles it to due process with respect to action not directed at that property."). Viewing these authorities together, this Court concludes that James cannot state a procedural due process claim based on Evanston's grant of a municipal use exemption to allow the IPS to be built on an adjacent property even though that action may have harmed the value of his property.

Even if there were a protected property interest in property values, "the procedures 'due' in zoning cases are minimal." *River Park, Inc. v. City of Highland Park*, 23 F.3d 164, 166 (7th Cir. 1994). And where, as here, "zoning decisions are confided to a legislative rather than a judicial body ... the affected persons have no right to notice and an opportunity for a hearing: no right, in other words, to procedural due process." *Ind. Land Co. v. City of Greenwood*, 378 F.3d 705, 710 (7th Cir. 2004). Thus, the Seventh Circuit's precedents "establish difficult terrain for a procedural due process claim to proceed" in the zoning context. *Pittsfield Dev., LLC v. City of Chicago*, No. 17 C 1951, 2017 WL 5891223, at \*9 (N.D. Ill. Nov. 28, 2017). Here, the notice and opportunity to be heard provided

by Evanston was limited but not non-existent. For example, the Fifth Ward's Alderman's newsletter included an agenda for a meeting that included as a topic for discussion "Niles Morton Grove Water Pumping Station Proposals." (Compl. ¶ 22.) Further, the proposal to locate the IPS at 2525 Church Street was addressed at two public City Council committee meetings followed by a meeting of the full City Council. Given the minimal process due for zoning decisions, the Court finds that Evanston provided sufficient process.

**\*14** In short, the Court finds that the allegations of the complaint fail to establish a protected property interest. And in any case, Evanston provided constitutionally sufficient notice and opportunity to be heard. Consequently, James has failed to state a procedural due process claim.

### E. Substantive Due Process

Finally, James asserts a claim for violation of his right to substantive due process against Evanston. Like a procedural due process claim, a substantive due process claim requires that a plaintiff plead an "[i]ntrusion upon a cognizable property interest." *Gen. Auto Serv. Station v. City of Chicago*, 526 F.3d 991, 1002 (7th Cir. 2008). Thus, the Court's conclusion above that James failed to plead a protected property interest is fatal to his substantive due process claim. *Id.* Nonetheless, James's substantive due process claim fails even assuming a property interest.

"A government entity must have exercised its power without reasonable justification in a manner that shocks the conscience in order for a plaintiff to recover on substantive due process grounds." *Bettendorf v. St. Croix County*, 631 F.3d 421, 426 (7th Cir. 2011) (internal quotation marks omitted). Substantive due process does not afford "a blanket protection against unjustifiable interferences with property .... [a]nd it does not confer on federal courts a license to act as zoning boards of appeal." *Gen. Auto Serv. Station*, 526 F.3d at 1000 (internal quotation marks and citations omitted). "Unless a governmental practice encroaches on a fundamental right, substantive due process requires only that the practice be rationally related to a legitimate governmental interest, or alternatively phrased, that the practice be neither arbitrary or irrational." *Id.* (internal quotation marks omitted).

James argues that his substantive due process claim implicates his fundamental right to equal protection of the laws.[8] To

state an equal protection claim, James must adequately allege that Evanston acted with a racially discriminatory purpose.

*Chavez v. Ill. State Police*, 251 F.3d 612, 635–36 (7th Cir. 2001). A discriminatory purpose means that "the decisionmaker ... selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). Because this Court has already found that James has failed to allege a discriminatory purpose on the part of Evanston, he cannot maintain a substantive due process claim predicated on an equal protection violation.

Having failed to plead a violation of a fundamental right, James must demonstrate that Evanston's zoning decision was either arbitrary or irrational. James does not attempt to challenge Evanston's decision to place the IPS at 2525 Church Street as not rationally related to a legitimate government interest. And indeed, Evanston's approval of land within its city limits for the placement of the IPS was rationally related to its legitimate interest, especially since Evanston stood to benefit financially as the supplier of the water being pumped by the IPS. Instead, James argues that it was irrational for Evanston to approve a municipal use exemption for the IPS since it knew that the exemption was facially inapplicable. But a municipality's alleged misinterpretation of its own ordinance does not, by itself, implicate substantive due process. *See Tucker v. City of Chicago*, 907 F.3d 487, 494 (7th Cir. 2018); *CIMA Devs. Ltd. P'ship v. City of West Chicago*, No. 19 C 2193, 2021 WL 736224, at \*2 (N.D. Ill. Feb. 25, 2021). James's substantive due process claim is therefore dismissed.

### III. State-Law Claim

**\*15** James's complaint also asserts a state-law claim for violation of the Illinois Civil Rights Act, 740 ILCS 23/5. Having dismissed the federal claims over which the Court had original jurisdiction, it is within this Court's discretion to decline to exercise supplemental jurisdiction over this remaining state-law claim. *RWJ Mgmt. Co. v. BP Prods. N. Am., Inc.*, 672 F.3d 476, 479 (7th Cir. 2012).

Where a federal district court dismisses all claims under its original jurisdiction before trial, "the presumption is that the court will relinquish federal jurisdiction over any supplemental state-law claims." *Id.* "The presumption is rebuttable, but it should not be lightly abandoned, as it is based on a legitimate and substantial concern with

minimizing federal intrusion into areas of purely state law." *Id.* The Seventh Circuit has identified certain circumstances that can rebut the presumption, including:

> (1) the statute of limitations has run on the pendent claim, precluding the filing of a separate suit in state court; (2) substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort; or (3) when it is absolutely clear how the pendent claims can be decided.

*Id.* at 480. Here, James has failed to show that any of these circumstances are applicable. For that reason, the Court relinquishes jurisdiction over his state-law claim.

**CONCLUSION**

For the foregoing reasons, Defendants' motions to dismiss (Dkt. Nos. 22, 23) are granted and James's complaint is dismissed without prejudice. Accordingly, Defendants' joint motion to strike (Dkt. No. 20) is denied as moot. Defendants argue that the dismissal should be with prejudice, the Court disagrees. A plaintiff "whose original complaint has been dismissed under Rule 12(b)(6) should be given at least one opportunity to try and amend [his] complaint before the entire action is dismissed." *Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*, 895 F.3d 933, 941 (7th Cir. 2018). Because the Court cannot conclude that granting James leave to amend would be futile, the federal claims are dismissed without prejudice.

**All Citations**

Not Reported in Fed. Supp., 2021 WL 4459508

---

### Footnotes

1    Evanston's Zoning Code is found in Title 6 of Evanston's Code of Ordinances. Citations are made to the version of the Code of Ordinances enacted on January 8, 2018 (Supplement 13, Update 2), as that was the version in effect at all times relevant here.

2    While Evanston contends that this Court lacks jurisdiction over James's purportedly unripe claims, the Seventh Circuit clarified just before *Williamson County* was overruled that the case had "nothing to do with subject-matter jurisdiction." *Kolton v. Frerichs*, 869 F.3d 532, 533 (7th Cir. 2017). At the same time, it recognized that courts, including the Seventh Circuit, had characterized *Williamson County* as about jurisdiction, surmising that "[t]his may reflect a bygone practice of using the term 'jurisdiction' loosely to refer to all obstacles to decision on the merits." *Id.* at 534. Despite its criticism, the Seventh Circuit did not go on to address whether a *Williamson County* ripeness challenge should be brought under a rule other than Rule 12(b)(1). Moreover, in a case decided after *Kolton*, the Seventh Circuit stated that the "ripeness arises out of the Constitution's case-or-controversy requirement," *Church of Our Lord & Savior Jesus Christ v. City of Markham*, 913 F.3d 670, 676 (7th Cir. 2019), suggesting that Rule 12(b)(1) remains the proper procedural route to raise a ripeness challenge. *See also Harer v. Casey*, 962 F.3d 299, 306 (7th Cir. 2020) ("[R]ipeness implicates the district court's subject-matter jurisdiction under Article III of the Constitution....").

3    Because James referenced Evanston's website in his complaint concerning its contents could be incorporated by reference. *See Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012) ("[T]he incorporation-by-reference doctrine provides that if a plaintiff mentions a document in his complaint, the defendant may then submit the document to the court without converting defendant's 12(b)(6) motion to a

Case: 3:24-cv-50369 Document #: 12 Filed: 09/12/24 Page 76 of 76 PageID #:357

James v. City of Evanston, Not Reported in Fed. Supp. (2021)

motion for summary judgment."). Alternatively, the Court could take judicial notice of Evanston's webpage. *See* Goplin v. WeConnect, Inc., 893 F.3d 488, 491 (7th Cir. 2018) (finding that where a party refers to another party's website in its briefing, the district court may take judicial notice of the entire contents of that website); *Denius v. Dunlap*, 330 F.3d 919, 926 (7th Cir. 2003) (noting that government websites are judicially noticeable).

4　The third and fourth sentences of the municipal use exemption are best understood as elaborating on the minimization of adverse impact from noncompliance criterion.

5　Further supporting the Court's interpretation is the fact that later amendments to the Zoning Code resulted in the restructuring of the municipal use exemption. What used to be the first two sentences of the exemption are now separate subsections (A) and (B). Those subsections have also been reworded in a way that reinforces their distinctness. Thus, subsection (B) begins "Where the construction of buildings and structures owned or operated by the City do not comply with all of the requirements of the underlying district," thereby emphasizing that subsection (B) is only intended to apply in that specific circumstance.

6　Even before the Supreme Court's *Comcast* decision, the Seventh Circuit interpreted both § 1981 and § 1982 to require a plaintiff to plead that racial prejudice was a but-for cause of the interference with property rights or refusal to transact. *Comcast*, 140 S. Ct. at 1014; *Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Stop Treaty Abuse-Wis., Inc.*, 991 F.2d 1249, 1257 (7th Cir. 1993).

7　The Commission also briefly considered another Evanston location before deciding on 2525 Church Street, but James makes no allegation regarding the demographic makeup of the residents near that site. (*See* Compl. ¶ 18.)

8　The Court assumes for present purposes that a substantive due process claim can be predicated on a violation of the right to equal protection. However, generally, "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive of substantive due process must be the guide for analyzing these claims." *Albright v. Oliver*, 510 U.S. 266, 273 (1994).

---

**End of Document**　　　　　　　　　　　　　　© 2024 Thomson Reuters. No claim to original U.S. Government Works.